[No. B207571. Second Dist., Div. Eight. July 15, 2009.]

DEBORAH DUNN YEAGER et al., Plaintiffs and Appellants, v.
BLUE CROSS OF CALIFORNIA, Defendant and Appellant.

## COUNSEL

Selman Breitman, Mark F. Didak, Neil H. Selman, Craig R. Breitman; Law Office of Mark F. Didak and Mark F. Didak for Plaintiffs and Appellants.

Reed Smith, Margaret M. Grignon, Kurt C. Peterson, Kenneth N. Smersfelt, Zareh Jaltorossian and Eric C. Schaffer for Defendant and Appellant.

## OPINION

**RUBIN, Acting P. J.**—Deborah Dunn Yeager appeals, for herself and as class representative for all others similarly situated, from the trial court's

summary judgment dismissing her complaint against respondent Blue Cross of California. Her complaint alleges Blue Cross violated its statutory duty under Health and Safety Code section 1374.55 to offer coverage for treatment of infertility in the group health plan that Blue Cross provided to Dunn Yeager's employer. We affirm.

## FACTS AND PROCEEDINGS

Appellant Deborah Dunn Yeager is employed by Westmont College. Dunn Yeager belongs to the college's group health plan with Blue Cross. Every year, Blue Cross gives the college an annual renewal package for the health plan containing, among other things, a checklist of legally mandated health insurance benefits that the plan must make available. Among those mandates, Health and Safety Code section 1374.55 obligates Blue Cross to offer to provide coverage for treatment of infertility.[1] In compliance with that statute, Blue Cross's renewal package with Westmont College offers to pay up to $2,000 a year for half the cost of each group member's treatment for infertility. The package states:

"Blue Cross of California . . . is required to offer coverage for certain health benefits to Applicants for a Group Benefit Agreement/Policy and to Groups renewing their Group Benefit Agreement/Policy with Blue Cross . . . . The optional benefits offered and their costs are set forth below.

"[Accept [ ] Decline [ ] Infertility Treatment]

"Coverage for diagnosis and treatment of infertility at 50% payment rate, benefit payments to $2,000 during a calendar year. The Calendar Year Deductible is waived. Coverage does not include laboratory medical procedures involving the actual in vitro fertilization process. [Insurance Code section] 10119.6/[Health and Safety Code section] 1374.55 [¶] Cost: Single - $8.45 Two-Party - $17.75 Family - $25.35" (Boldface omitted.)

Westmont College declined to buy coverage for infertility treatment. One factor in the college's decision was the coverage's high price.

Appellant could not become pregnant without medical assistance. Able to afford only limited infertility treatment that proved ineffective, appellant sued Blue Cross in 2006, alleging causes of action for unfair competition and false

---

[1] All statutory references are to the Health and Safety Code unless otherwise stated.

advertising.[2] (Bus. & Prof. Code, §§ 17200, 17500.) Appellant sought recovery of her out-of-pocket expenses for the infertility treatment she received above Blue Cross's $2,000 annual limit, and for her pain and suffering from losing her chance to bear a child.

Blue Cross moved for summary judgment. It argued it had complied with Health and Safety Code section 1374.55 by offering coverage for infertility treatment. The motion disputed appellant's contention that section 1374.55 obligated Blue Cross to provide a certain amount of coverage at a particular premium. According to Blue Cross, section 1374.55 left the amount and cost of coverage to negotiation between Blue Cross and Westmont College. Agreeing with Blue Cross, the court entered summary judgment and dismissed the complaint. This appeal followed.[3]

## DISCUSSION

Section 1374.55 obligated Blue Cross to offer coverage for treatment of infertility. The statute provides: "(a) . . . every health care service plan contract . . . shall offer coverage for the treatment of infertility . . . under those terms and conditions as may be agreed upon between the group subscriber and the plan. . . . [¶] (b) For purposes of this section . . . 'Treatment for infertility' means procedures consistent with established medical practices in the treatment of infertility by licensed physicians and surgeons including, but not limited to, diagnosis, diagnostic tests, medication, surgery, and gamete intrafallopian transfer."[4]

█ Appellant contends Westmont College's health plan with Blue Cross violates section 1374.55. We disagree. Section 1374.55 obligates Blue Cross to *offer* coverage for infertility treatment, and leaves to Blue Cross and Westmont College's mutual agreement the amount and cost of that coverage—the "plan . . . shall offer coverage . . . as may be agreed upon . . . ."

[2] Appellant also alleged causes of action for negligence per se and breach of statutory duties, to which Blue Cross successfully demurred. Appellant concedes those causes of action fail if we find Blue Cross complied with section 1374.55 in its offer to cover treatment of infertility.

[3] Blue Cross also moved for summary judgment on the ground appellant lacked standing under unfair competition and false advertising laws because she had not lost money or property. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 324–325 [93 Cal.Rptr.3d 559, 207 P.3d 20] [Prop. 64 adopted by voters in 2004 imposed requirement of monetary or property loss for standing under unfair competition law].) Because we find the trial court properly found Blue Cross complied with section 1374.55 and affirm on that basis, we need not address the standing issue.

[4] Section 1374.55, subdivision (b) exempts coverage for "in vitro fertilization," which it defines as "the laboratory medical procedures involving the actual in vitro fertilization process," which the record describes as the procedure during which an egg is fertilized in a special dish. Coverage for in vitro fertilization is not at issue here.

(§ 1374.55, subd. (a).) Blue Cross complied with the statute by offering such coverage, which the college declined.[5]

Appellant contends Blue Cross did not comply with section 1374.55 because the policy's $2,000 in annual benefits was not enough to address a typical plan member's infertility. According to appellant, only about 15 percent of couples suffering infertility can be successfully treated for less than $4,000 (the plan's $2,000 annual cap on benefits plus the patient's 50 percent copayment). Some infertility therapies cost, according to appellant, nearly $20,000 to succeed. A $2,000 annual benefit, she argues, is akin to an insurer pretending to provide "full coverage" against earthquake damage to a building by offering a benefit of only $1. Appellant might be correct that $1 in earthquake coverage, or $2,000 dollars for infertility treatment, does not provide "full coverage," but nowhere does section 1374.55 state the coverage that the parties negotiate must be *full*. Nevertheless, appellant suggests Blue Cross must cover the entire cost of appellant's infertility treatment to comply with the statute. She states: "[A] benefit of $2,000 per year cannot constitute 'coverage for treatment for infertility' within the meaning of the statute because $2,000 is usually insufficient to diagnose, let alone provide all established medical treatment procedures . . . for, infertility used by licensed physicians and surgeons." Her argument for full coverage finds no support in the statute's language, and it is the statutory language which we must follow.

Appellant alternatively contends the policy must cover treatment for infertility "on the same terms and conditions as other medical conditions covered by the plan, without (for example) lower sub-limits or higher co-pays and deductibles." She argues the $2,000 limit and 50 percent copayment "are not close to the terms" that Blue Cross applies to other medical conditions in Westmont College's plan. Blue Cross's proposed coverage for treatment of infertility therefore, according to appellant, does not satisfy the statutory mandate that Blue Cross treat infertility the same as other "bodily dysfunctions."

To support her demand for greater coverage, appellant ignores statutory language that says Blue Cross need only *offer* coverage under terms and conditions to which Westmont College and Blue Cross *agree*. Reaching beyond the statute's language, she drags forward the uncodified preamble to section 1374.55 which recites the Legislature's findings in passing the legislation. Citing the preamble, she contends the policy's coverage for treatment of infertility and all other medical conditions must be "the same"

---

[5] Appellant contends the health plan also violates Insurance Code section 10119.6. Blue Cross and appellant agree Insurance Code section 10119.6 is similar in its effect to section 1374.55, and they also agree our analysis and disposition of appellant's section 1374.55 claim applies equally to Insurance Code section 10119.6.

because the preamble states: "The Legislature finds and declares the following: [¶] . . . [¶] (2) Infertility is a medical illness or condition similar to other illnesses or conditions that is created by the malfunction of other bodily organs, and thus is no different than other illnesses [or] conditions and should be treated for purposes of insurance the same as any other body d[y]sfunction. [¶] . . . [¶] (4) Insurance coverage for infertility is uneven, inconsistent, and frequently subject to arbitrary decisions which are not based on legitimate medical considerations." (Stats. 1989, ch. 734, § 1, p. 2428.)

Legislative findings and statements of purpose in a statute's preamble can be illuminating if a statute is ambiguous.[6] (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1118 [81 Cal.Rptr.2d 471, 969 P.2d 564].) But a preamble is not binding in the interpretation of the statute. Moreover, the preamble may not overturn the statute's language. (*Id.* at p. 1119; *Peralta Community College Dist. v. Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 52 [276 Cal.Rptr. 114, 801 P.2d 357].) Here, no ambiguity exists in the statute to help appellant; the statute obligates Blue Cross to *offer* coverage, and Blue Cross did so. The Legislature's refusal to dictate the amount of coverage and its cost is not ambiguity—it is silence. We may not make a silent statute speak by inserting language the Legislature did not put in the legislation. (*Camarena v. State Personnel Bd.* (1997) 54 Cal.App.4th 698, 702 [62 Cal.Rptr.2d 775].)

The Legislature knows how to establish a health plan's coverage and costs when it chooses. For example, in 1999, it enacted a mental health insurance mandate. (§ 1374.72.) The mandate obligated health plans to provide coverage (not merely offer it) for the diagnosis and treatment of mental illness equal to coverage that the plans applied to other medical conditions.[7] The statute dictated that the terms and conditions of coverage "that shall be applied equally to all benefits under the plan contract, shall include, but not be limited to, the following: [¶] (1) Maximum lifetime benefits. [¶] (2) Copayments. [¶] (3) Individual and family deductibles." (§ 1374.72, subd. (c).)

---

[6] Appellant cites *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1184 [78 Cal.Rptr.3d 572], and *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579] for the proposition that we ought to liberally interpret statutes governing employee health benefits. Her reliance on those decisions is unconvincing, however, because *Amaral* dealt with a city's living wage ordinance, not a health service plan, and *Industrial Welfare Com.* dealt with industrywide wage orders involving minimum wages and maximum hours.

[7] Section 1374.72 states: "(a) Every health care service plan . . . shall *provide* coverage for the diagnosis and medically necessary treatment of severe mental illnesses . . . under the same terms and conditions applied to other medical conditions as specified in subdivision (c)." (Italics added.) We quote the pertinent portion of subdivision (c) in the text, *post.*

The directness of the mental health mandate contrasts with section 1374.55 before us. A health plan must *provide* mental health coverage; it need only *offer* infertility treatment coverage. The mental health statute explicitly states that the terms and conditions of coverage must be *equal* to those for other benefits under the plan; the statute here, in contrast, leaves the terms and conditions to the parties' mutual agreement. Indeed, appellant must reach past section 1374.55 to its preamble to try to support her argument that the terms and conditions for infertility coverage must be the same as for other conditions, which, we note, is not what the preamble says; the preamble instead says "Infertility is a medical illness or condition similar to other illnesses or conditions . . . no different than other illnesses [or] conditions and should be treated for purposes of insurance the same as any other body d[y]sfunction." The fairest reading of the "any other body d[y]sfunction" language is as an acknowledgement that infertility is one of many other body dysfunctions and carriers must offer coverage for it, not that it must offer the same coverage as it does for other body dysfunctions. Finally, the mental health statute specifically identifies the terms and conditions it encompasses—lifetime benefits, copayments, and deductibles; in contrast, the statute here does not identify the terms and conditions, if any, to which the parties *must* agree, saying only that they "may be agreed upon."

Unlike its handiwork in section 1374.55, but like section 1374.72's mental health mandate, the Legislature has enacted other health insurance requirements that tie the terms and conditions of coverage to something ascertainably concrete. For example, in mandating coverage for registered domestic partners, section 1374.58, subdivision (a) states a "group health care service plan . . . shall provide equal coverage . . . for the registered domestic partner . . . to the same extent, and subject to the same terms and conditions, *as provided to a spouse* . . . ." (Italics added.) In directing coverage for maternity benefits, section 1373.4, subdivision (a)(1) prohibits "a copayment or deductible . . . that exceeds the most common amount of the copayment or deductible contained in the contract" for other covered medical conditions. And, in requiring coverage for orthotic and prosthetic devices and services, section 1367.18, subdivision (b) currently states, "the amount of the benefit . . . shall be no less than the annual and lifetime benefit maximums applicable to the basic health care services" of a physician, hospital, medical laboratory and the like.[8] It further states that "[a]ny copayment, coinsurance, deductible, and maximum out-of-pocket amount . . . shall be no more than the most common amounts applied to . . . basic health care services . . . ." (§ 1367.18, subd. (b).) In each instance, the Legislature has tethered a class of benefits to an objective standard measured by the carrier's already existing coverage.

---

[8] In defining "basic health care services," section 1367.18 refers to section 1367, which refers to section 1345, subdivision (b), from which we derive our list of covered services.

A previous version of the orthotic and prosthetic statute drives home the point. Before 2007, the statute paralleled the infertility statute before us by leaving the terms and conditions of coverage to the parties' mutual agreement. (Former § 1367.18.) But in 2006, the Legislature amended section 1367.18 to its current form, capping copayments and the like and setting a minimum benefit equal to the plan's annual and lifetime benefits for other basic health care services. (*Id.*, subd. (b).) Tellingly, the Legislature did not change the infertility statute, even though the Legislature's revision of the orthotic and prosthetic statute shows the Legislature knows how to limit or end the parties' prerogative to define by mutual agreement the scope and expense of coverage under their health plan.

The infertility statute is similar to a number of health insurance mandates that leave the terms and conditions of coverage to the parties' agreement. Those mandates include coverage for treatment of alcoholism (§ 1367.2); special footwear for persons suffering from foot disfigurement (§ 1367.19); and acupuncture (§ 1373.10). Each of them directs that a health plan "shall offer coverage . . . under such terms and conditions as may be agreed upon . . ." by the parties. Our research found no published decision that interpreted those mandates as requiring a health plan to provide a particular amount of coverage at a particular cost, which is the thrust of appellant's contention that Blue Cross must offer treatment for infertility on the same terms and conditions as other medical conditions. Moreover, those mandates and the infertility statute contrast illuminatingly with the insurance requirement for home health care. (§ 1374.10.) As with those mandates, including the one for infertility treatment, a health plan must offer coverage for home health care, which the plan member may reject. (*Id.*, subd. (a).) Unlike those other mandates, however, the home health care statute dictates at least two components of the obligatory offer: first, the offer must cap an insured's deductible to an amount set by the statute at $50 per year (*id.*, subd. (d)); second, it must provide for at least 100 home visits per year (*id.*, subd. (c)). A health plan's statutory obligation to offer infertility treatment carries no similar specificity in the components that the plan must offer. (§ 1374.55, subd. (a) ["shall offer coverage for the treatment of infertility . . . under those terms and conditions as may be agreed upon . . . ."].)

The legislative history of section 1374.55 confirms that the Legislature did not intend to require a particular amount of coverage at any particular price. A state Senate committee stated: "The insurer and plan must offer the availability of the benefit. The group policyholder, contract holder or subscriber retains the authority to determine whether to purchase and/or design the benefit." (Sen. Com. on Insurance, Claims and Corporations, com. on Assem. Bill No. 900 (1989–1990 Reg. Sess.) as introduced Feb. 27, 1989.) Other available history confirms that the statute required only that the insurer make an offer—it did not dictate what the offer must entail. (See arguments

in support of Assem. Bill No. 900 (1989–1990 Reg. Sess.) as introduced Feb. 27, 1989 ["The insurance companies are neutral on the bill because this is a Mandate to Offer only."].)

For what purpose, one might ask, did the Legislature mention terms and conditions of coverage if it left insurers such as Blue Cross free to offer coverage unacceptable to policy subscribers such as Westmont College, making coverage for treatment of infertility arguably illusory? The trial court found misplaced appellant's contention that the terms and conditions for treatment of infertility must be the same as other medical conditions because the contention mistakenly assumed those other terms and conditions were uniform. The court stated: "[Appellant] argues the legislative finding that infertility 'should be treated for purposes of insurance the same as any other body d[y]sfunction' means coverage for infertility treatment must be offered 'subject to the same terms and conditions as other medical conditions covered by the plan, without lower sublimits or higher co-pays and deductible.' [Citation.] [¶] The argument is without merit, if only because [appellant] presumes a uniformity that does not exist. At any rate, the legislative statement does no more than equate infertility with other conditions. It says nothing about how much insurance should be offered to treat it."

The Legislature did not state its purpose, but one plausible reason is a legacy of bygone days that conceived of health more narrowly than commonly understood today. As society's understanding of human health and well-being has expanded in recent decades, health care has grown beyond physicians in white coats or surgeons in scrubs. Many health insurance mandates extend coverage to matters once thought outside the domain of conventional medical care, such as acupuncture, chemical dependency and abuse, and mental illness. The expansion of health insurance mandates in these areas on the same "terms and conditions" as traditional areas has financially underwritten the availability of those new realms to patients. It is in this light that we understand section 1374.55.

Human reproduction and infertility, and their kindred cousins involving the beginning of life, birth control, and abortion, are fraught with nonmedical concerns. The Legislature hinted at such cultural and moral sensitivities in its preamble to section 1374.55, stating insurance coverage for treatment of infertility has been "uneven, inconsistent, and frequently subject to arbitrary decisions which are not based on legitimate medical considerations." (See, e.g., § 1367.25 [health plan must provide coverage for contraceptives unless plan is through a religious employer that prohibits contraception]; Welf. & Inst. Code, § 14132, subd. (aa)(8) [Medi-Cal benefits include "comprehensive

clinical family planning services" but exclude abortion services].) In that light, section 1374.55 little supports appellant's contention that the Legislature perceived the problem it was remedying with section 1374.55 was insurance coverage for treatment of infertility that was insufficiently generous; more likely, the problem may have been that coverage was perceived to be difficult, if not impossible, to find. By requiring insurers to *offer* coverage, the Legislature might have envisioned offers would trigger negotiations between the insurer, employers and insureds that would break the logjam blocking coverage and permit the parties to reach a mutually agreeable bargain. The record before us does not permit us to conclude the Legislature was unduly optimistic. Moreover, appellant offers no evidence that insurers today refuse to offer coverage for treatment of infertility that would suggest the Legislature guessed wrong about section 1374.55's anticipated effect. And, of course, if the Legislature is unhappy with insurance benefits produced by these negotiations, it has the power to change section 1374.55 to dictate precise terms of coverage.

Appellant develops for the first time on appeal a theory that Blue Cross violated section 1374.55 by refusing to negotiate with Westmont College over the amount and cost of coverage for treatment of infertility. Appellant draws a duty to negotiate from the statute's mandate that "[e]very plan shall communicate the availability of that coverage to all group contractholders and to all prospective group contractholders with whom they are negotiating."[9] According to appellant, $2,000 in benefits for treatment of infertility is too trifling to be a good faith offer of coverage. Citing evidence that Blue Cross offered only a $2,000 benefit for treatment of infertility under its California plans on a take-it-or-leave-it basis, appellant contends Blue Cross violated its duty to negotiate coverage, making summary judgment improper. We leave for another day the question of how generous a benefit must be to satisfy section 1374.55's mandate to offer coverage. We need not reach that question because appellant's pleadings framed the issues Blue Cross needed to address in its motion for summary judgment. (*Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1342 [67 Cal.Rptr.2d 726]; *Lennar Northeast Partners v. Buice* (1996) 49 Cal.App.4th 1576, 1582 [57 Cal.Rptr.2d 435].) Appellant's theory of liability was that Blue Cross's failure to offer full coverage violated Blue Cross's duty to offer coverage. Blue Cross's motion for summary judgment showed, and our decision today confirms, otherwise.

---

[9] Section 1374.55, subdivision (a) states in part: "[E]very health care service plan contract . . . shall offer coverage for the treatment of infertility . . . under those terms and conditions as may be agreed upon between the group subscriber and the plan. Every plan shall communicate the availability of that coverage to all group contractholders and to all prospective group contractholders with whom they are negotiating."

## DISPOSITION

The judgment is affirmed. Respondent Blue Cross to recover its costs on appeal.

Flier, J., and Bigelow, J., concurred.

A petition for a rehearing was denied August 13, 2009, and the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied September 23, 2009, S175620. Werdegar, J., did not participate therein.