Filed 2/11/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re DONOVAN L., JR., a Person Coming Under the Juvenile Court Law. | D068304 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., | (Super. Ct. No. J518488A) |
| Plaintiffs and Respondents, | |
| v. | |
| SHANNON L. et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of San Diego County, Gary M. Bubis, Judge. Reversed in part and affirmed in part.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant Shannon L.

Patti Dikes, under appointment by the Court of Appeal, for Defendant and Appellant Donovan L., Sr.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula C. Roach, Senior Deputy County Counsel, for Plaintiff and Respondent San Diego County Health and Human Services Agency.

Jamie A. Moran, under appointment by the Court of Appeal, for Plaintiff and Respondent David S.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Minor Donovan L., Jr.

Shannon L., the biological mother of minor Donovan L., Jr. (DJ), and her husband Donovan L., Sr. (Donovan) appeal from the juvenile court's June 2015 disposition order. The juvenile court ruled that although Donovan was DJ's conclusively presumed father under Family Code[1] section 7540, David S. was DJ's presumed father under section 7611, subdivision (d), and DJ had three parents under recently enacted section 7612, subdivision (c). Section 7612, subdivision (c) provides that in an appropriate action, "if the court finds that recognizing only two parents would be detrimental to the child," a court may find a child has more than two parents. We conclude the juvenile court erred in applying section 7612, subdivision (c) in this case, given its determination that David and DJ lacked an existing parent-child relationship. Accordingly, we reverse the disposition order insofar as it determines David is DJ's presumed father under Family Code section 7612, subdivision (c) and orders services and visitation for David.

---

[1]     All further statutory references are to the Family Code, unless otherwise indicated.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2015, the San Diego County Health and Human Services Agency (Agency) filed a juvenile dependency petition under Welfare and Institutions Code, section 300, subdivision (b), alleging risk of harm to DJ due to Shannon's substance abuse. The 2015 case is the third dependency proceeding involving four-year-old DJ; as described below, the Agency previously filed petitions in 2012 and 2014.

Shannon was married to Donovan at the time of DJ's conception in 2010 and birth in 2011. In 2010, Shannon had an affair with David and informed him she was pregnant. David did not seek involvement in Shannon's pregnancy or DJ's rearing until he saw Shannon and one-year-old DJ at a shopping center parking lot in July 2012. Seeing a resemblance, David took a paternity test on his own initiative and determined he was DJ's biological father. He told friends and family he was DJ's father and asked Shannon for visits with DJ. She facilitated a few visits between DJ and David, unbeknownst to Donovan.

Shannon and DJ stayed at David's apartment for two weeks in August 2012, when she and Donovan were having marital problems. During that time, Shannon called the police because David locked her out after they fought over child custody. When officers arrived, they found David and DJ " 'passed out' " on the bed with approximately 50 marijuana plants growing in the apartment. Following this incident, the Agency filed the 2012 dependency petition under Welfare and Institutions Code, section 300, subdivision (b).

At the detention hearing in the 2012 case, the juvenile court found Donovan to be DJ's conclusively presumed father under section 7540 and authorized the Agency to release DJ to Donovan.[2]  David initially sought presumed father status, but he later withdrew that request and asked to be named DJ's biological father.  In October 2012, the court conferred biological father status to David, "[b]ased on the agreement of all parties and the LabCorp paternity test results."  In November 2012, the court terminated jurisdiction in the 2012 case, after the parties voluntarily agreed to facilitate visitation between David and DJ.

In 2014, Shannon tested positive for methadone when giving birth to her second child.  Shannon and Donovan agreed to a voluntary case and services to address Shannon's addiction issues.

The Agency became involved with DJ for a third time in March 2015, after Shannon tested positive for hydromorphone when giving birth to her third child.  The 2015 dependency petition underlies the present appeal.  At the detention hearing on March 24, 2015, the juvenile court noted Donovan was DJ's conclusively presumed father under section 7540 and allowed DJ to live with him, provided that Shannon move out of their home.

---

[2]    Section 7540 provides:  "Except as provided in Section 7541, the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage."  Section 7541 provides an exception to the conclusive presumption based on blood tests performed before the child's second birthday.  (§ 7541, subd. (b); *Craig L. v. Sandy S.* (2004) 125 Cal.App.4th 36, 46.)

In April 2015, David appeared at the disposition hearing and requested presumed father status under section 7611, subdivision (d).[3]  The court noted that Donovan had already been named a conclusively presumed father and continued the disposition hearing to May 2015.  At the continued hearing, the court made a true finding on the Agency's petition and ordered supervised visitation for David.  The court deferred the paternity issue, explaining:

> "First of all, there's a question of fact whether or not [David] is presumed.
> That's going to require an evidentiary hearing.  Secondly, if he is found to
> be a presumed father, he is not entitled to a weighing process because a
> [section ]7540 father [Donovan] is a conclusively presumed father.
> Thirdly, there's a question of fact whether or not the court, under
> [section 7612, subdivision (c),[4]] the new statute, should recognize him as a
> father and give [DJ] two fathers."

At the contested disposition hearing on June 12, 2015, the court heard testimony from the social worker, David, David's mother, Shannon, Donovan, and Donovan's father.  DJ's position, expressed during closing arguments, was that David did not qualify as a third parent under section 7612, subdivision (c).  The court took judicial notice of

---

3    Pursuant to section 7611, subdivision (d), a person is a presumed parent if he or she "receives the child into his or her home and openly holds out the child as his or her natural child."

4    Section 7612, subdivision (c) provides:  "In an appropriate action, a court may find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child.  In determining detriment to the child, the court shall consider all relevant factors, including, but not limited to, the harm of removing the child from a stable placement with a parent who has fulfilled the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time.  A finding of detriment to the child does not require a finding of unfitness of any of the parents or persons with a claim to parentage."

5

orders from the 2012 dependency case and received into evidence the Agency's reports and the parties' paternity questionnaires. On the basis of this evidence, the court declared David to be DJ's presumed father under section 7611, subdivision (d), and applying section 7612, subdivision (c), held DJ would suffer detriment were the court to rule he had only two parents.

In pronouncing its ruling, the court expressed "no doubt" that Donovan had been "a great father" and a "superlative dad," stating it could make that finding "beyond a reasonable doubt, conclusively." The court believed Shannon sought out David in 2012 because she wanted options while facing marital problems with Donovan. The court did not rule David was a *Kelsey S.*[5] father, but suggested that to the extent Shannon initially sought out David and later changed her mind, the case supported a *Kelsey S.* argument to some degree. The court believed Donovan and Shannon would likely prevent DJ from learning David was his biological father and that Donovan sought to move the family to Arizona to "get as far away as possible" from David.

The court credited David's testimony that although he did not get involved with DJ initially, he decided to seek visitation and parental status after seeing DJ in 2012. Although David withdrew his request for presumed father status in the 2012 case, the

---

5    In *Adoption of Kelsey S*. (1992) 1 Cal.4th 816, 849 (*Kelsey S.*), the Supreme Court recognized a "child's well-being is presumptively best served by continuation of the [biological] father's parental relationship" where "an unwed [biological] father promptly comes forward and demonstrates a full commitment to his parental responsibilities — emotional, financial, and otherwise —" but is precluded from establishing a meaningful relationship with the child as a result of actions unilaterally taken by a third party.

court concluded he did so because of an agreement between the parties that "made the whole case go away."  The court relied on the social worker's testimony and photographs to conclude that DJ had "nice visits" with David and "seem[ed] pretty happy at these various events."  The court rejected "very similar and consistent" testimony from Shannon, Donovan, and Donovan's father that DJ referred to David as a "mean man" and exhibited behavioral problems after supervised visits began in May 2015, instead attributing those behavioral problems to Shannon's departure from the home.

Finding David to be a presumed parent under section 7611, the court turned to section 7612, subdivision (c) and determined DJ would suffer detriment if the court found he had only two parents.  In reaching this decision, the juvenile court relied heavily on David's biological ties to DJ:

> "With regard to [section ]7612[, subdivision ](c), I would find that it would be detrimental for this child to only have two parents.
>
> "Now, I want to be clear.  [The statute] says 'in determining detriment to the child, the court shall consider all rel[evant] factors.'  And that's what I'm considering.  In particular, I am considering the fact that this child has a cultural heritage; that this child has DNA running through his veins; that this child has another family that was introduced to him at a younger [stage of his] life who seemed to want to be involved with him; that this child will, in fact, have to do those family trees; that this child will, if he finds out at age 21 that he had a different bio father that was hidden from him, will have an effect on him.  It will affect him — because I've been doing this a long time and I've seen those type of effects. It's just one of those things. It's not fair to lie to these kids about this type of situation, it just isn't.
>
> "Under certain circumstances they may not [find] out.  But under this circumstance, lying is not going to do any good.  And I don't believe for a second that either [Donovan or Shannon] have any real intention of introducing [David], this father, in the near future.  Because I don't know when the good time would be . . . .  They want their own family together. If this marriage falls apart, and [Donovan] for some reason gets custody,

7

he's not going to warm up to [David], considering [David] slept with his wife. Those are all the types of problems that can arise in this very complex situation, which is all fueled by drugs. So I will make that detriment finding, because I think that the evidence supports it.

"Now, I understand that it says that I have to consider the harm of removing the child from a stable placement with a parent who has fulfilled the child's physical needs. [Donovan] defines that exactly. I'm not removing the child from [Donovan]. I don't know if it will ever happen. But the fact of the matter is, I envision more visitation happening, that [DJ] learns about this 'mean man,' [David], and that he warms up to him and that he will learn to have two fathers like a lot of kids learn. Like kids learn that they have two moms. There is a book out there, Heather Has Two Mommies. This is 2015. This is the 21st century. I didn't create all this stuff, but it's out there. And I have an obligation to view these statutes and apply the facts to the statutes."

Significantly, in finding detriment under section 7612, subdivision (c), the court found no existing bond between David and DJ, stating: "I'm going to note that [David] *does not have a strong relationship with this child*." (Italics added.) The court granted visitation to David, finding he had "done everything [he was] supposed to do," but ordered DJ's initial visits with David to be supervised while DJ and David developed a relationship: "At least maybe the first two, you want to see how the exchange goes. . . . I'm not concerned that he's a danger to the child but *because he has to develop a relationship*, and there is some testimony about the child's reactions, I wanted to just cover that." (Italics added.) The court granted the Agency discretion to allow unsupervised and overnight visits with 48 hours' notice to counsel, "as the child warms up and feels comfortable."

Turning to the dispositional findings, the court found there was clear and convincing evidence of a substantial risk to DJ's "physical health, safety, protection or

8

physical or emotional well being" if he were returned to Shannon's custody. The court placed DJ with Donovan and ordered services and visitation for Donovan, Shannon, and David. Shannon and Donovan each filed a timely notice of appeal.

II.

DISCUSSION

Shannon and Donovan raise four main arguments on appeal. They contend: (1) David is estopped from claiming presumed father status in this action because he withdrew his request for presumed father status in the 2012 action; (2) the juvenile court erred in declaring David a presumed father under section 7611, subdivision (d); (3) the juvenile court erred in finding detriment under section 7612, subdivision (c) and concluding DJ had three parents; and (4) the juvenile court erred in granting services to David. DJ joins in Shannon's and Donovan's briefs and argues section 7612, subdivision (c) did not apply because he lacked an emotional bond with David.

As we will explain, David is not barred under equitable principles from seeking presumed father status. However, this is not "an appropriate action" to recognize three parents under section 7612, subdivision (c). Because the juvenile court determined DJ did not have an existing relationship with David, there is no substantial evidence to support a finding that "recognizing only two parents would be detrimental to the child" within the meaning of section 7612, subdivision (c).

A.    *Estoppel*

Shannon and Donovan argue David is barred under principles of collateral estoppel and equitable estoppel from seeking presumed father status because in the 2012

9

dependency proceeding, David failed to rebut Donovan's section 7540 marital presumption, withdrew his request for presumed father status, and agreed to biological father status. As we will explain, neither collateral estoppel nor equitable estoppel applies.

Collateral estoppel, or issue preclusion, "prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action. [Citation.] Under issue preclusion, the prior judgment conclusively resolves an issue actually litigated and determined in the first action." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824 (*DKN Holdings*).) "[I]ssue preclusion applies: (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*Id.* at p. 825.) Collateral estoppel is "grounded on the premise that 'once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed.' " (*Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860, 864, citing *Parklane Hosiery Co. v. Shore* (1979) 439 U.S. 322, 336, fn. 23.) "[T]he public policies underlying collateral estoppel — preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation — strongly influence whether its application in a particular circumstance would be fair to the parties and constitute sound judicial policy." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 343 (*Lucido*).)

We reject the Agency's argument that collateral estoppel does not apply in the juvenile dependency context because "cases are, by their nature, fluid" and rulings can be

10

modified under Welfare and Institutions Code section 388. (See *In re Joshua J.* (1995) 39 Cal.App.4th 984, 993-994 [collateral estoppel barred relitigation of an issue decided in an earlier dependency proceeding]; 7 Witkin, Cal. Procedure (5th ed. 2008) Judgment, § 429, p. 1080 [listing dependency proceedings among "[o]ther proceedings applying the doctrine of collateral estoppel"].)[6]

Nevertheless, Shannon and Donovan have not met their burden to establish that David's presumed parentage was "actually litigated and necessarily decided" in the 2012 action, as required for collateral estoppel. (*DKN Holdings*, *supra*, 61 Cal.4th at p. 825; *Lucido*, *supra*, 51 Cal.3d at p. 341.) In the 2012 action, the parties did not actually litigate whether David was a presumed father because David withdrew his request and reached an agreement with Shannon and Donovan to seek biological father status. "If the parties expressly exclude a particular issue from consideration, . . . no collateral estoppel results." (7 Witkin, Cal. Procedure, *supra*, Judgment, § 430, p. 1081; see *Hurst v. Hurst* (1964) 227 Cal.App.2d 859, 865 [prior action that resulted in settlement without a

---

6    The Agency cites *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, but that case and others like it merely hold that collateral estoppel does not bar relitigation of sexual molestation in dependency proceedings where there is *new evidence* to support a petition for modification under Welfare and Institutions Code section 388. (*Sheila S.*, at p. 879; *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1757-1758 [new evidence supported accused parents' denial of molestation]; *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1039 [collateral estoppel should be narrowly applied in dependency cases involving sexual abuse because child molestation victims may not initially make complete disclosures].)

11

determination of paternity had no preclusive effect on the paternity issue in a later divorce proceeding].)[7]

Shannon and Donovan's equitable estoppel argument fares no better. " '[T]he doctrine of equitable estoppel is a rule of fundamental fairness whereby a party is precluded from benefiting from his inconsistent conduct which has induced reliance to the detriment of another [citations]. Under well settled California law four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. . . .' " (*In re Marriage of Turkanis & Price* (2013) 213 Cal.App.4th 332, 352.)

Here, all parties knew David was DJ's biological father. There were no facts David knew that Shannon and Donovan did not know. This alone precludes application of equitable estoppel. (*In re A.O.* (2004) 120 Cal.App.4th 1054, 1059 [estoppel did not apply because the party seeking its application "was not ignorant of the facts"].) Furthermore, equitable estoppel does not apply because there are no facts suggesting Shannon or Donovan detrimentally relied on David's decision to "settle" for biological

---

7      Similarly, res judicata, or claim preclusion, does not apply because the 2012 dependency action ended in a voluntary agreement, not "a final judgment on the merits." (*DKN Holdings*, *supra*, 61 Cal.4th at p. 824; see 7 Witkin, Cal. Procedure, *supra*, Judgment, § 370, p. 995 [judgment is "on the merits" only "if the substance of the claim is tried and determined"].)

fatherhood in the 2012 action. (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1317 [ignorance of the facts and detrimental reliance are "two of the essential elements of equitable estoppel"]; *In re Lisa R.* (1975) 13 Cal.3d 636, 645 [no estoppel where party "suffered no injury or detriment"].)

B.    *Section 7611, Subdivision (d)*

Shannon and Donovan argue the juvenile court erred in finding David to be DJ's presumed father under section 7611, subdivision (d).   Under section 7611, subdivision (d), a person is presumed a parent if he or she "receives the child into his or her home and openly holds out the child as his or her natural child."  The court heard testimony that DJ lived with David for two weeks in August 2012 and that, beginning in 2012, David told friends and family that DJ was his son.[8] We will assume, without deciding, that there is substantial evidence to support the juvenile court's ruling that David qualifies as a presumed parent under section 7611, subdivision (d).[9]

---

[8]    The court also heard testimony that DJ had weekly visits with David from August to November 2012 and periodic visits thereafter; spent two Easters and one Christmas Eve with David and his family; received Christmas and birthday gifts from David; received diapers, toys, and clothing from David; and had a birthday party scheduled with David's family (that did not ultimately occur).

[9]    Shannon and Donovan attempt to reargue evidence considered and rejected by the juvenile court, such as evidence that DJ called David a "mean man" and experienced behavioral changes after beginning to visit him.  However, on review for substantial evidence, " ' "[w]e do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

13

C.      *Parentage Presumptions*

Donovan argues that, as a conclusively presumed father under section 7540, his parentage claim defeats any claim to parentage that David may assert under section 7611, subdivision (d).  Because DJ is more than two years old, Donovan's conclusive marital presumption may no longer be rebutted.  (§ 7541, subd. (b); *Miller v. Miller* (1998) 64 Cal.App.4th 111, 119; *Craig L. v. Sandy S.*, *supra*, 125 Cal.App.4th at p. 46.)  The Agency does not dispute that Donovan is DJ's conclusively presumed father, but it contends parentage law changed in 2014 so as to allow David to assert a parallel parentage claim under section 7612.[10]

As a general rule, " 'there can be only one presumed father.' "  (*In re Jesusa V.* (2004) 32 Cal.4th 588, 603.)  *Unless section 7612, subdivision (c) applies*, which we address below, Donovan's conclusive marital presumption under section 7540 defeats any parentage claim in David.  (*Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 239-240; *Michelle W. v. Ronald W.* (1985) 39 Cal.3d 354, 362.)

D.      *Section 7612, Subdivision (c)*

Central to this appeal is the application of section 7612, subdivision (c).  In 2013, the Legislature enacted section 7612, subdivision (c) to allow courts to recognize that a child has more than two parents in certain limited contexts:

> "*In an appropriate action*, a court may find that more than two persons with a claim to parentage under this division are parents *if the court finds that*

---

10      David and Shannon do not address the effect of Donovan's conclusive presumption but join in the Agency's and Donovan's arguments, respectively.

14

*recognizing only two parents would be detrimental to the child.* In determining detriment to the child, the court shall consider all relevant factors, including, but not limited to, the harm of removing the child from a stable placement with a parent who has fulfilled the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment to the child does not require a finding of unfitness of any of the parents or persons with a claim to parentage."

(Stats. 2013, ch. 564, § 6.5, italics added.) The statute went into effect on January 1, 2014. The parties agree that section 7612, subdivision (c) allows a court to recognize three parents only in "rare cases" where a child truly has more than two parents, but they disagree as to whether this is such a case.

The juvenile court determined DJ would face detriment under section 7612, subdivision (c) if the court were to find he had only two parents and therefore ruled David was to be DJ's third parent under the statute. Shannon and Donovan contest this ruling. Specifically, Shannon and Donovan challenge the court's finding of detriment under the statute, arguing there is no evidence DJ was missing anything from his life that David could provide. DJ joins in their arguments, contending there is no evidence he ever formed any real emotional attachment with David to support a finding of detriment under section 7612, subdivision (c). In response, the Agency suggests David and DJ shared a close bond between July 2012 and December 2014, such that "DJ would suffer great harm if his relationship with David ended." The Agency nevertheless concedes "David is not the poster boy for application of the statute."

As we explain, this is not "an appropriate action" for application of section 7612, subdivision (c). Because the juvenile court determined David and DJ lacked an existing

15

parent-child relationship, there is no substantial evidence to support a finding that "recognizing only two parents would be detrimental to the child" within the meaning of the statute. (§ 7612, subd. (c).)

1. *Legal Principles*

The parties disagree as to the applicable standard of review for the juvenile court's application of section 7612, subdivision (c) to this case. Shannon, Donovan, and DJ argue a juvenile court's ruling under the statute must be reviewed for substantial evidence. By contrast, the Agency and David argue abuse of discretion is the appropriate standard, based on the statute's language that a court "may find" more than two parents. (§ 7612, subd. (c).)

We will interpret the statute de novo, as we must. (*In re J.P.* (2014) 229 Cal.App.4th 108, 122; *In re Alanna A.* (2005) 135 Cal.App.4th 555, 563.) Then, in applying the statute to this case, we will determine whether the juvenile court's findings under section 7612, subdivision (c) are supported by substantial evidence. This analysis is the same under either the substantial evidence or abuse of discretion standard of review. (See *In re C.B.* (2010) 190 Cal.App.4th 102, 123 [on abuse of discretion review, "the substantial evidence test applies to pure findings of fact"].) Because we will conclude substantial evidence is lacking to support a finding of detriment within the meaning of section 7612, subdivision (c), we need not decide the standard of review for all rulings in which the juvenile court finds that a child has more than two parents under section 7612, subdivision (c).

16

As with any statute, " '[w]e begin with the fundamental rule that our primary task is to determine the lawmakers' intent.' " (*In re B.A.* (2006) 141 Cal.App.4th 1411, 1418.) "Where the language of the statute is clear and unambiguous, we follow the plain meaning of the statute and need not examine other indicia of legislative intent." (*In re J.P.*, *supra*, 229 Cal.App.4th at p. 123.) Section 7612, subdivision (c) is ambiguous as to what constitutes "an appropriate action" so as to allow a court to find a child has more than two parents. Therefore, on our own motion, we take judicial notice of the legislative history of Senate Bill No. 274 (2013-2014 Reg. Sess.) to resolve the ambiguity. (Evid. Code, §§ 452, 459; *In re J.W.* (2002) 29 Cal.4th 200, 210.)[11]

2.      *Legislative History*

Section 7612, subdivision (c) directs that a court "may find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child." In determining detriment in this context, courts must "consider all relevant factors, including, but not

---

[11]      We may take judicial notice of different versions of the same bill; the Legislative Counsel's Digest; reports by the Senate and Assembly Judiciary Committees; reports by the Senate and Assembly Appropriations Committees; and reports by the Office of Senate Floor Analyses. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 31-37 [collecting cases]; see *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 279, fn. 9.) As a general rule, "legislative history must shed light on the collegial view of the Legislature *as a whole*." (*Kaufman*, at p. 30.) Some of the reports we consider include statements by the author of Senate Bill No. 274. Because these "statements appear to be part of the debate on the legislation and were communicated to other legislators, we can regard them as evidence of legislative intent." (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 928 (*Carter*); *cf. Kaufman*, at pp. 37, 39 [statements by bill's author that were not communicated to the Legislature as a whole are not deemed legislative history].)

17

limited to, the harm of removing the child from a stable placement with a parent who has fulfilled the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time."  (§ 7612, subd. (c).)[12]

The Legislature borrowed the "detriment to the child" standard from section 3041, which governs custody awards to a nonparent over the objection of a parent.[13]  (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 274 (2013-2014 Reg. Sess.) as amended Apr. 1, 2013, p. 6.)  Detriment under section 3041 considers "the prospect that a *successful, established* custodial arrangement would be disrupted" (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1123, italics added) or the harm in "removing a child from what has been a *stable, continuous, and successful placement* is detrimental to the child" (*Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 491, italics added).  Although courts have concluded detriment under section 3041 may include the loss of an *existing* relationship with a nonparent (*Guardianship of Olivia J.* (2000) 84 Cal.App.4th 1146,

---

[12]    An earlier version of the bill, which the Governor vetoed, was based on the "best interest of the child" standard.  (Sen. Bill No. 1476 (2011-2012 Reg. Sess.) § 5 ["In an appropriate action, a court may find that a child has more than two natural or adoptive parents if required to serve the best interest of the child."]; Governor's veto message to Sen. on Sen. Bill No. 1476 (Sept. 30, 2012) (2011-2012 Reg. Sess.).)  Redrafting the legislation in 2013, the Legislature incorporated the "detriment to the child" standard.

[13]    Section 3041, subdivision (c) provides that " 'detriment to the child' includes the harm of removal from a stable placement of a child with a person who has assumed, on a day-to-day basis, the role of his or her parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment does not require any finding of unfitness of the parents."

18

1159), the parties have not pointed us to, nor have we found, any case applying section 3041 to protect a parental relationship that has not yet developed.

Indeed, legislative reports indicate that section 7612, subdivision (c) seeks to "protect[] children from harm by *preserving the bonds* between children and their parents" and avoid the "disastrous emotional, psychological, and financial consequences for a child, who may be separated from one or both of the parents *he or she has always known*." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 274 (2013-2014 Reg. Sess.) May 21, 2014, p. 7, italics added; Assembly Com. on Judiciary, com. on Sen. Bill No. 274 (2013-2014 Reg. Sess.) as amended May 14, 2013, pp. 4-5, italics added.) These authorities suggest that "an appropriate action" for application of section 7612, subdivision (c) is one in which a court finds an *existing*, rather than potential, relationship between a child and a putative third parent, such that "recognizing only two parents would be detrimental to the child." (§ 7612, subd. (c).)[14]

We find considerable support for our statutory interpretation in an uncodified section of the legislation.[15] Section 1 to Senate Bill No. 274 states in relevant part:

---

[14] The legislative history does not disclose consideration of the situation presented here, where a biological father may satisfy section 7611 but does not have an existing parent-child relationship. (Assembly Com. on Judiciary, com. on Sen. Bill No. 274 (2013-2014 Reg. Sess.) as amended May 14, 2013, p. 10.)

[15] Statements in an uncodified section of the same bill " 'may properly be utilized as an aid in construing a statute.' " (*Carter*, *supra*, 38 Cal.4th at p. 925; *id*. at p. 930 [determining legislative intent by reference to uncodified section]; see *Yeager v. Blue Cross of California* (2009) 175 Cal.App.4th 1098, 1103 ["statements of purpose in a statute's preamble can be illuminating if a statute is ambiguous"].)

19

"(a) Most children have two parents, but *in rare cases*, children have more than two people *who are that child's parent in every way*. Separating a child from a parent has a devastating psychological and emotional impact on the child, and courts must have the power to protect children from this harm.

"(b) The purpose of this bill is to abrogate *In re M.C.* (2011) 195 Cal.App.4th 197 insofar as it held that where there are more than two people who have a claim to parentage under the Uniform Parentage Act, courts are prohibited from recognizing more than two of these people as the parents of a child, regardless of the circumstances.

"(c) This bill does not change any of the requirements for establishing a claim to parentage under the Uniform Parentage Act. It only clarifies that where more than two people have claims to parentage, the court may, if it would otherwise be detrimental to the child, recognize that the child has more than two parents.

"(d) It is the intent of the Legislature that this bill will only apply in the *rare case where a child truly has more than two parents*, and a finding that a child has more than two parents is necessary *to protect the child from the detriment of being separated from one of his or her parents.*"

(Sen. Bill No. 274 (2013-2014 Reg. Sess.) § 1, italics added.) Senate Bill No. 274, section 1, indicates that the Legislature intended amendments to section 7612 to be narrow in scope and to apply only in "rare cases" in which a child "truly has more than two parents" who are parents "in every way." (Sen. Bill No. 274 (2013-2014 Reg. Sess.) § 1.) In those rare cases, the Legislature sought to protect the child from the "devastating psychological and emotional impact" that would result from "[s]eparating [the] child from a parent." (*Ibid.*) Accordingly, "an appropriate action" for application of section 7612, subdivision (c) is one in which there is an *existing* parent-child relationship between the child and the putative third parent, such that "recognizing only two parents would be detrimental to the child." (Sen. Bill No. 274 (2013-2014 Reg. Sess.) § 1.)

20

### 3. *Harmonizing Section 7612 Within the Uniform Parentage Act*

As our Supreme Court has explained, " 'every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' " (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1118-1119; see *People v. Verduzco* (2012) 210 Cal.App.4th 1406, 1414 [courts must "consider the consequences that will flow from a particular statutory interpretation"].) Our interpretation of what constitutes "an appropriate action" under section 7612, subdivision (c) harmonizes the statute within the broader statutory framework under the Uniform Parentage Act (UPA).

In making parentage determinations under the UPA, courts seek to protect *existing* relationships rather than foster *potential* relationships. (See *Rodney F. v. Karen M.*, *supra*, 61 Cal.App.4th at p. 239 ["There is an obvious distinction between a biological father who has actually established a parent and child relationship, and a man who has not established such a relationship but would like to do so."]; *In re D.M.* (2012) 210 Cal.App.4th 541, 555 [juvenile court erred in focusing on the "possibility that [the mother's boyfriend] would develop a parental relationship with the child, not that the relationship already existed"]; *In re A.A.* (2003) 114 Cal.App.4th 771, 788 ["[T]he state's interest in these matters includes preserving developed parent-child relationships whether or not the father figure has biological ties to the child."].)

Over the past three decades, courts increasingly have looked to the *nature* of the parent-child relationship to resolve paternity disputes. (*Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1210-1216 [collecting cases].) "The courts have repeatedly held, in

21

applying paternity presumptions, that the extant father-child relationship is to be preserved at the cost of biological ties." (*In re Nicholas H.* (2002) 28 Cal.4th 56, 65.) The " ' "social relationship" ' " between a putative father and child " ' "is much more important, to the child at least, than a biological relationship of actual paternity." ' " (*In re Marriage of Freeman* (1996) 45 Cal.App.4th 1437, 1445.) Thus, although our Supreme Court has rejected the notion that an unwed biological father has a protected liberty interest in *establishing* a relationship with his child, the court has recognized a biological father's liberty interest "in *maintaining and preserving an existing* parent-child relationship." (*Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 942, italics added; see *Lisa I. v. Superior Court* (2005) 133 Cal.App.4th 605, 616 [a biological father does not have a liberty interest "in the *opportunity* to develop a relationship with" the child].)[16] Biological paternity may be afforded greater weight when the child is an infant; however, as the child gets older, courts seek to preserve the stronger social bond over biological ties. (*In re Kiana A.* (2001) 93 Cal.App.4th 1109, 1120.)

Together, these authorities support our statutory interpretation as applied here to four-year-old DJ: "an appropriate action" for application of section 7612, subdivision (c) requires a court to find an existing, rather than potential, relationship between a putative

---

[16] An exception to this general principle can be found in *Kelsey S.*, *supra*, 1 Cal.4th at pages 848-849, which recognized a liberty interest where a biological father is *precluded* from establishing a relationship with his child. Here, however, the juvenile court did not make a ruling under *Kelsey S.*, and the issue of whether David might qualify as a *Kelsey S.* father is not before us on appeal. The policy motivations underlying *Kelsey S.* therefore do not apply.

third parent and the child, such that "recognizing only two parents would be detrimental to the child." (§ 7612, subd. (c).) This interpretation harmonizes section 7612, subdivision (c) within the broader statutory framework under the UPA.[17]

4. *Application*

The juvenile court found that David "does not have a strong relationship" with DJ and ordered visits to be supervised "because [David] has to develop a relationship." Despite these findings, the court applied section 7612, subdivision (c), relying on David's biological ties to DJ and the potential harm to DJ from possibly not finding out about his roots until later in his life. This was error.

There is no indication the Legislature intended section 7612, subdivision (c) to apply to a person like David, who, at the time of the contested disposition hearing on parentage, lacked an existing relationship with the child. A person who lacks an existing parent-child relationship is not a child's "parent in every way." (Sen. Bill No. 274 (2013-2014 Reg. Sess.) § 1, subd. (a).) Nor would separation from such a person cause

---

[17] In his reply brief, Donovan references Welfare and Institutions Code, section 366.26, subdivision (c)(1)(B)(i), arguing David was merely a " 'friendly visitor' " to DJ rather than a parental figure. Although the termination of parental rights is not at issue here, mere friendly visits between a biological father and child would not support a finding that termination would be "detrimental to the child" under that statute. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297; *In re Angel B*. (2002) 97 Cal.App.4th 454, 468.) Here, too, DJ's "nice visits" and happy photographs with David are not substantial evidence to support a finding "that recognizing only two parents would be detrimental to the child." (§ 7612, subd. (c).)

23

"devastating psychological and emotional impact on the child." (*Ibid*.)[18] The court's speculation as to potential harm from DJ discovering his biological father later in life is not substantial evidence supporting a finding of detriment within the meaning of section 7612, subdivision (c). (See *In re Steve W.* (1990) 217 Cal.App.3d 10, 22 [juvenile court's conclusion "supported by little more than speculation" not based on substantial evidence].)

Application of section 7612, subdivision (c) to the facts presented here would open the floodgates to virtually all biological fathers who may qualify as a presumed parent under section 7611 and seek to form a relationship with the child. Such an interpretation would apply far beyond the "rare case" envisioned by the Legislature. (Sen. Bill No. 274 (2013-2014 Reg. Sess.) § 1.) Indeed, application of the statute here would call into question the continued viability of section 7612, subdivision (b). If the possible loss of a potential relationship were sufficient to find detriment and recognize three parents under section 7612, subdivision (c), we question when, if ever, a court would weigh competing parentage presumptions under section 7612, subdivision (b).

---

18     David compares the facts of this case with those in *In re M.C., supra,* 195 Cal.App.4th 197, to argue that because section 7612, subdivision (c) abrogates that ruling, the juvenile court properly found DJ had three legal parents under the statute. However, the Legislature sought to abrogate *M.C. only* "insofar as it held that . . . courts are prohibited from recognizing more than two . . . people as the parents of a child, regardless of the circumstances." (Sen. Bill No. 274 (2013-2014 Reg. Sess.) § 1.) In other words, the Legislature sought to abrogate *M.C.*'s per se bar to recognizing a child has more than two parents; it did not specify whether, on the facts of *M.C.*, a court should now find the child has three parents.

Such a result would be untenable, given the express legislative intent to leave subdivision (b)'s weighing test intact:

> "[E]xisting law anticipates the situation where two or more presumptions of paternity conflict under the Family Code, and provides the following guidance: the presumption which on the facts is founded on the weightier considerations of policy and logic controls. Courts therefore, under current law, apply a critical analysis to situations where more than two presumptions exist. *This bill does not limit that analysis. . . .*"

(Assembly Com. on Judiciary, com. on Sen. Bill No. 274 (2013-2014 Reg. Sess.) as amended May 14, 2013, p. 7, italics added; see *id.* at p. 5 [explaining the legislation gives courts "flexibility": where there are more than two presumed parents, a "court *can, but is not required to,* recognize more than two people as parents of the child if it would otherwise be detrimental to the child" (italics added)].)

For these reasons, we conclude "an appropriate action" for application of section 7612, subdivision (c) is one in which there is an *existing* parent-child relationship between the child and the putative third parent, such that "recognizing only two parents would be detrimental to the child." (§ 7612, subd. (c).) Because the juvenile court determined David did not have an existing parent-child relationship with DJ, there is no substantial evidence to support a finding of detriment under the statute. This is not the "rare case" in which section 7612, subdivision (c) allows a court to find that a child has more than two parents. (Sen. Bill No. 274 (2013-2014 Reg. Sess.) § 1.) Consequently, section 7612, subdivision (c) does not apply, and Donovan's conclusive marital presumption under section 7540 defeats David's parentage claim under section 7611,

25

subdivision (d).  (*Michelle W. v. Ronald W.*, *supra*, 39 Cal.3d at p. 362; *Rodney F. v. Karen M.*, *supra*, 61 Cal.App.4th at p. 240.)

E.     *Services*

The juvenile court granted David supervised visitation with DJ and "enhancement services."  On appeal, the parties agree there is no statutory basis for "enhancement services" in the Welfare and Institutions Code, but disagree as to whether David is nevertheless entitled to services and visitation.  The Agency contends the juvenile court properly awarded David "maintenance services"; David joins in the Agency's argument. Donovan and Shannon argue the juvenile court erroneously granted services to a mere biological father when a conclusively presumed father exists.

The Agency's argument for "maintenance services" is premised on David being a member of DJ's "family" as a third parent under section 7612, subdivision (c).  The Welfare and Institutions Code permits maintenance services for "parents or guardians" or "families."  (Welf. & Inst. Code, §§ 362, subd. (c), 364, subd. (b), 16506.)  David is none of these.  Providing David with services does not serve the goals of *maintaining* DJ in Donovan's home by "eliminating the conditions or factors requiring court supervision." (*Id.*, § 364, subd. (b); see *id.*, § 16501, subd. (g) ["family maintenance services are activities designed to provide in-home protective services to prevent or remedy neglect, abuse, or exploitation, *for the purposes of preventing separation of children from their families*" (italics added)]; *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1154 ["family maintenance services . . . ameliorate the conditions that made the child subject to the court's jurisdiction"].)  Because he is not a parent, David is not entitled to services or

26

visitation.  (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 589 [courts may not order services or visitation for a biological father when a conclusively presumed father exists].)

## DISPOSITION

The juvenile court's June 12, 2015 disposition order is reversed insofar as it determines David is DJ's presumed father under Family Code section 7612, subdivision (c) and orders services (including the preparation of a case plan) and visitation for David.  In all other respects, the disposition order is affirmed.

IRION, J.

WE CONCUR:

McDONALD, Acting P. J.

O'ROURKE, J.