Filed 11/12/19

**CERTIFIED FOR PARTIAL PUBLICATION⁕**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| In re K.T., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.F. et al.,<br><br>    Defendants;<br><br>J.B. et al.,<br><br>    Interveners and Appellants. | E072082<br><br>(Super.Ct.No. J272724)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

---

⁕    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I-III and V-VIII.

William D. Caldwell, by appointment of the Court of Appeal, for Interveners and Appellants.

Michelle D. Blakemore, County Counsel, and Pamela J. Walls, Outside Counsel, for Plaintiff and Respondent.

San Bernardino County Children and Family Services (CFS) removed K.T. (K. or child) from his mother when he was about nine months old. At that time, a nurse noticed that he had an enlarged head. He was placed with distant relatives, Mr. and Ms. B., who were already caring for his older half-brother.

Further testing showed that K. had a subdural hematoma. Meanwhile, the B.'s began refusing to communicate with K.'s social worker or her "friends" in the same office, claiming that she had discriminated against them and insulted them.

CFS detained K., placed him in a special health care needs foster home, and filed a petition asking the trial court to remove him from the B.'s custody under section 387.[1] The B.'s, in turn, filed a "changed circumstances" petition under section 388, asking the trial court to return K. to them.

The trial court denied the section 388 petition, finding that the B.'s had not shown that they were qualified as a special health care needs foster home. It then granted the section 387 petition, finding that communication between the B.'s and CFS had broken down.

---

[1] This and all further statutory citations are to the Welfare and Institutions Code.

CFS contends that the B.'s lack standing to appeal from these orders, citing *In re Miguel E.* (2004) 120 Cal.App.4th 521. We agree with *Miguel E.* that, in general, a person from whom a child has been removed under section 387 lacks standing to challenge the removal. However, when that person is a relative, we disagree with *Miguel E.*, because under section 361.3, a relative has standing to appeal from a refusal to place a child with him or her (an argument that *Miguel E.* did not consider).

In the unpublished portion of this opinion, however, we reject the B.'s contentions. Hence, we will affirm.

I

THE CONTENTIONS OF THE PARTIES

The B.'s contend:

1. The trial court erred by ruling on the section 388 petition before the section 387 petition, rather than the other way round.

2. The trial court's order sustaining the section 387 petition is not supported by substantial evidence.

3. In ruling on the section 387 petition, the trial court erroneously failed to consider the relative placement factors listed in section 361.3.

In response, CFS contends:

1. The B.'s did not file a notice of appeal from the denial of the section 387 petition.

2. The B.'s lack standing to bring this appeal.

3

3. The denial of the B.'s earlier section 388 petition was collateral estoppel with respect to their section 388 petition currently at issue.

II

FACTUAL AND PROCEDURAL BACKGROUND

In December 2013, J.F. (mother) gave birth to K.'s older half-brother, C.U. In May 2015, when C.U. was a year and a half old, CFS detained him and filed a dependency petition concerning him. He was placed with the B.'s, his (and later K.'s) great-great-aunt and -uncle,[2] who wanted to adopt him. In May 2017, parental rights to C.U. were terminated.

---

[2] The record is unclear about the exact relationship between the B.'s and K.

The social worker described them as his aunt and uncle. In their section 388 petitions, they likewise described themselves as his aunt and uncle. Ms. B told doctors, however, that they were K.'s great-great-great-aunt and -uncle.

In court, there was this less than enlightening discussion:

"THE COURT: I believe the B[.'s] are the aunt and uncle, is that right, on the maternal side?

"MS. B[.]: Yes.

"MR. B[.]: Yes.

"[COUNTY COUNSEL]: I think Mother is their *great, great niece* somewhere down the line.

"THE COURT: Is *that* correct, the mother . . . is your *great niece*?

"MS. B[.]: Yes." (Italics added.)

In their briefs, however, both sides take the position that the B.'s are K.'s great-great-aunt and -uncle. We accept this as tantamount to a stipulation.

4

In August 2017, the mother gave birth to K. In September 2017, K.'s father R.T. (father) beat the mother, snatched K., got into a car, and deliberately hit the mother with the car. CFS detained the child from the father, placed him with the mother, and filed a dependency petition concerning him.

In November 2017, at the jurisdictional hearing, the trial court sustained jurisdiction based on risk of serious physical harm, failure to protect, and (solely as to the father) failure to support. (§ 300, subds. (a), (b), (g).)

Meanwhile, the mother repeatedly failed or missed drug tests, failed to go to domestic violence and parenting classes, and evaded the social worker's efforts to contact her. Accordingly, in December 2017, at the dispositional hearing, the trial court formally removed the child from both parents' custody. It ordered reunification services for the mother but bypassed them for the father.

The mother went to court for the dispositional hearing but left with the child before the case was called. As a result, a warrant was issued for the child.

On May 10, 2018, the child was located — at an apartment with the mother and the father — and detained. That afternoon, a nurse examined him. She noticed that he had an enlarged head and was very irritable.

Later that same day, the child was placed with the B's. The next day, the nurse told Ms. B. to have him "checked out" by a doctor.[3] Ms. B. scheduled an appointment

---

[3]    CFS states that "[o]n May 11, 2018, the nurse directed Mr. and Mrs. B to have [K.] seen by a doctor that day and no later than tomorrow." That is incorrect.

5

for him for May 29, 2018 (later rescheduled for June 4, 2018, at the doctor's request). The doctor ordered a CAT scan.

On June 15, 2018, the doctor's office phoned Ms. B. and told her that the doctor had mistakenly failed to order the CAT scan "stat" and she should take the child to an emergency room for a CAT scan immediately. That CAT scan showed a subdural hematoma that was "concerning for abusive head trauma."[4] The child was admitted to a hospital. Follow-up imaging indicated a "hypoxic injury" and "neuronal loss or dysfunction."

Meanwhile, according to the social worker, the B.'s had begun failing to respond to phone calls, emails, and messages from CFS. The B.'s disputed this. According to Ms. B., in May 2018, she and the social worker had had a disagreement over sibling visitation; the social worker was "insulting," "disrespectful," and "[d]iscriminatory." She decided to communicate through C.U.'s social worker, rather than K.'s, "to avoid confrontations."

---

On May 11, 2018, the nurse told Ms. B. to take the child to a doctor "as soon as you can"; if he was "acting real strange," she should take him to an emergency room, but if he was "acting normally," she could take him to her regular pediatrician.

On *June 11, 2018*, the nurse — evidently growing concerned — told *the social worker* "that the child needed to be taken to the doctor today, no later than tomorrow . . . ." It does not appear that the social worker relayed this to the B.'s.

[4] The hematoma was described as "chronic" yet "evolving."

On June 19, 2018, CFS detained the child from the hospital because it was not sure whether he had been injured while in the care of the mother or of the B.'s. In the detention report, however, the social worker also stated that "the minor's placement need[s] to be changed due to concerns unrelated to" his head injury.

CFS filed a supplemental petition under section 387. The petition contained no allegations regarding the head injury. Rather, it alleged that "[t]he previous disposition has not been effective in the protection or rehabilitation of the child" because "[t]he caregiver has failed to adequately comply with all components of the case plan."

On June 22, 2018, at the detention hearing on the section 387 petition, the trial court upheld the detention. The child was placed in a foster home for about a month and then moved to a "special health care needs" foster home. (See § 17700 et seq.)

In July 2018, the B.'s filed a section 388 petition, asking the trial court to return the child to them. It alleged, among other things, that K. was safe in their care and that he had already sustained his head injury before he was placed with them. The trial court denied the petition without a hearing, because "the request does not state new evidence or a change of circumstances" and because "the proposed change of order . . . does not promote the best interest of the child."

By late July 2018, the police concluded that the child suffered his injury before he was placed with the B.'s. In August 2018, a doctor concluded that he suffered the injury before he was three months old, and hence while he was still with the mother. Nevertheless, CFS decided not to return him to the B.'s, because he needed to be in a

7

"medically specialized placement," and because the social worker was having difficulty communicating with the B.'s.

In August 2018, the B.'s filed another section 388 petition, again seeking to have the child returned to them.[5] The trial court set a hearing on the petition.

Meanwhile, in or before September 2018, the child started having what appeared to be seizures.[6] His head was still growing too rapidly.

In December 2018, the trial court denied the section 388 petition. It explained:

"So the Court certainly understands that the issue the B[.'s] have raised here[,] and that is[,] first it was thought that it was unknown as to how K[.] came to have the intercranial issue that he had[,] and it was ultimately demonstrated that it was more likely to have occurred prior to the B[.'s] having K[.] with them.

"The issue that has arisen since then, however, is that K[.] is in a special needs home, requires special needs care, and that all of that is something that [the current foster parent] is qualified to give and has been certified[] []as a special needs home by our San Bernardino CFS and as a consequence that's where K[.] is now."

---

**5** While the petition was pending, the B.'s augmented it with three "addend[a]." CFS incorrectly characterizes these as new petitions. It also incorrectly states that the trial court immediately denied each of these "petitions." The implication is that they were repetitive (or even vexatious). Actually, the trial court merely set the addenda for hearing on the same date as the original petition. It considered all of the addenda before it ruled.

**6** The child had a "paternal family history of seizures . . . ." His older sibling C.U. — although not biologically related to the father — also had apparent seizures.

It found no evidence that the B.'s were qualified as a special health care needs home. It concluded that granting the section 388 petition would not promote the child's best interest.

It then sustained the section 387 petition, finding that "[t]he caregiver has failed to adequately comply with all components of the case plan."

The B.'s each filed a notice of appeal.

### III

### THE SCOPE OF THE APPEAL

Preliminarily, CFS contends that the B.'s notices of appeal must be construed as appealing only from the trial court's ruling on the section 388 petition, and not from its ruling on the section 387 petition.

The notices of appeal did not specify any order by title, date, or type of hearing. Instead, they stated that the B.'s were appealing because: "The Court decided that the B[.]'s were not qualified as special health care providers to care for relative foster child K[.]T[.]. K[.]T[.] was not returned to the B[.']s."

"[A] notice of appeal must be liberally construed, and is sufficient if it identifies the particular judgment or order being appealed." (Cal. Rules of Court, rule 8.405(a)(3); see also *id*., 8.100(a)(2).) "'[I]t is, and has been, the law of this state that notices of appeal are to be liberally construed so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not

9

possibly have been misled or prejudiced.' [Citations.]" (*In re Joshua S.* (2007) 41 Cal.4th 261, 272.)

The B.'s section 388 petition was the mirror image of the section 387 petition, in that the section 387 petition sought to remove the child from them, while the section 388 petition sought to have the child returned to them. Accordingly, the statement in the notice of appeal that the B.'s were appealing because K. was not returned to them was sufficient to embrace the orders on both petitions. CFS does not claim that it was prejudiced by the notice of appeal in any way; on this record, it was not.

CFS also contends that any appeal from the order denying the B.'s *first* section 388 petition is untimely. Of course, this is correct, but it is a strawman argument. The B.'s opening brief does not challenge that order. And in their reply brief, they confirm that they are challenging only the rulings in December 2018 on the section 387 petition and on their *second* section 388 petition.

IV

THE B.'S APPELLATE STANDING

CFS contends that the B.'s lack standing to bring this appeal.

*In re Miguel E.*, *supra*, 120 Cal.App.4th 521 supports this contention. It held that grandparents lacked standing to appeal from an order removing the children from the grandparents' custody under section 387. (*Id.* at pp. 538-540.) It explained: "Grandparents were present in court for the . . . detention hearing . . . and Grandmother was present for the . . . hearing [on the section 387 petition]. They did not ask to address

10

the court.  At the time of the . . . hearing, Grandparents had not applied for or achieved de facto parent status.  Thus, they were merely relatives, not parties.  '[O]nly parties of record may appeal.  [Citation.]  A party of record is a person named as a party to the proceedings or one who takes appropriate steps to become a party of record in the proceedings.'  [Citation.]" (*Id.* at p. 539.)

In their reply brief, the B.'s assert that *Miguel E.* is distinguishable because they did "address the court" and, more generally, they did participate in the proceedings below.  However, they participated only in the hearing on their section 388 petition and in a discussion of sibling visitation issues; they did not participate in the hearing on the section 387 petition.  Indeed, in their opening brief, they conceded this, stating:  "[T]he record indicates [the B.'s] were not permitted to participate in the section 387 proceedings."  (Punctuation altered.)

The B.'s were not entitled to notice of the section 387 hearing.  (§§ 297, subd. (b)(1), 387, subd. (d), incorporating §§ 290.1, 290.2, 291.)  They did not seek de facto parent status.  As relatives, they had the right to submit information about the child to the court.  (Cal. Rules of Court, rule 5.534(b)(2).)  With the trial court's permission, for good cause shown, they could be present at the hearing and address the court.  (*Id.*, rule 5.534(b)(1).)  Nevertheless, they were not parties to the section 387 petition.  Under *Miguel E.*, then, it would seem that they lack standing.

However, the B.'s also assert that they have standing because this is, in effect, an appeal from "the denial of their request for placement under section 361.3."

The grandmother in *Miguel E.* could have made the same argument. However, she did not. *Miguel E.* is authority for rejecting the arguments that were made in that case, but not for rejecting this particular argument. "It is axiomatic that cases are not authority for propositions that are not considered. [Citation.]" (*California Building Industry Association v. State Water Resources Control Board* (2018) 4 Cal.5th 1032, 1043.)

Section 361.3 provides: "In any case in which a child is removed from the physical custody of his or her parents . . . , preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . ." (§ 361.3, subd. (a).) It further provides that, "[i]n determining whether placement with a relative is appropriate, the county social worker and court shall consider" certain specified factors. (*Ibid.*) Finally, it provides that "whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements." (§ 361.3, subd. (d).)

The parties agree that B.'s were K.'s great-great-aunt and -uncle. Hence, they were "relatives" within the meaning of section 361.3. It defines "relative" as "an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship, including stepparents, stepsiblings, and *all relatives whose status is preceded by*

12

*the words* 'great,' '*great-great*,' or 'grand,' or the spouse of any of these persons . . . ."
(§ 361.3, subd. (c)(2), italics added.)[7]

*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023 held that the child's grandmother — even though not a party — had standing to appeal from an order denying her request for placement under section 361.3. (*Cesar V.*, *supra*, at pp. 1034-1035.) It stated: "[The grandmother]'s separate interest in her relationship with . . . her grandson[] is legally protected in section 361.3, which confers upon a grandparent the right to preferential consideration for placement. '[A]ny person having an interest recognized by law in the subject matter of the judgment, which interest is injuriously affected by the judgment' is considered a 'party aggrieved' for purposes of appellate standing. [Citation.]" (*Ibid.*)

Section 387, as relevant here, provides:

"(a) An order changing or modifying a previous order by removing a child from the physical custody of a . . . relative[] or friend and directing placement in a foster home . . . shall be made only after noticed hearing upon a supplemental petition.

"(b) The supplemental petition shall be filed by the social worker in the original matter and shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child or, in the case of a placement with a relative, sufficient to show that the

---

**7** Hence, if the B.'s were K.'s *great-great-great*-aunt and -uncle — as Ms. B. once said they were — they would not have any rights under section 361.3.

13

placement is not appropriate in view of the criteria in Section 361.3." (§ 387, subds. (a), (b).)

Thus, the test for granting a section 387 petition has two alternative prongs — (1) the previous disposition has not been effective, or (2) a placement with a relative is not appropriate under section 361.3. If the trial court sustains the petition based on the second prong, then it is effectively denying the relative's request for placement under section 361.3. However, even if it sustains the petition based on the first prong, it is making a "new placement," and therefore it is required under section 361.3 to "consider[]" the relative for placement and to evaluate the factors listed in section 361.3. Accordingly, once again, it is effectively denying the relative's request for placement under section 361.3. To put it another way, we cannot honestly distinguish a decision not to place a child with a relative from a decision to remove a child from a relative.

We therefore conclude that, under *Cesar V.*, when a child is removed from a placement with a relative under section 387, the relative has standing to appeal.

We also note (though it should be obvious) that, with respect to their section 388 petition, the B.'s were parties. Any "person having an interest in [the] child" can file a section 388 petition. (§ 388, subd. (a)(1); see *In re Hirenia C*. (1993) 18 Cal.App.4th 504, 513, 515-516 [even if former foster parent was not de facto parent, "the statutory grant of standing contained in section 388 is sufficiently broad to include [her] within its coverage."].) When their petition was denied, the B's were aggrieved. (See generally *In*

14

*re Lauren P.* (1996) 44 Cal.App.4th 763, 768.) Hence, they also have standing to appeal the denial of their section 388 petition.

V

COLLATERAL ESTOPPEL REGARDING THE SECTION 388 PETITION

CFS contends that the denial of the B.'s first section 388 petition required the denial of their second section 388 petition as a matter of collateral estoppel.

The order denying the first section 388 petition was immediately appealable. (See *In re K.C.* (2011) 52 Cal.4th 231, 235-236.) "If an order is appealable . . . , and no timely appeal is taken therefrom, the issues determined by the order are res judicata. [Citation.]" (*In re Matthew C*. (1993) 6 Cal.4th 386, 393.)

Collateral estoppel applies only to an issue that has been actually litigated. (*In re Donovan L.* (2016) 244 Cal.App.4th 1075, 1084.) The B.'s argue that their first section 388 was not actually litigated because it was denied without a hearing. We disagree. "For purposes of collateral estoppel, an issue was actually litigated in a prior proceeding if it was properly raised, submitted for determination, and determined in that proceeding. [Citation.]" (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 511.) Here, the B.'s litigated their petition by presenting it to the trial court for decision.

We do reject the application of collateral estoppel here, but for a different reason: The second section 388 petition was based on subsequent changed circumstances and/or new evidence.

15

Section 388 allows the trial court "to change, modify, or set aside any order of court previously made" based on "change of circumstance or new evidence . . . ." Accordingly, the order denying the first section 388 petition determined that, *as of July 2018*, there was no change of circumstances and no new evidence requiring that the child be returned to the B.'s.

As of July 2018, however, doctors, the police, and CFS were still looking into whether B. was injured before or after he was placed with the B.'s. It was not determined until later in July that he had been injured before he was placed with the B.'s; it was not determined until August 2018 that he had been injured before he was even three months old. Of course, it could be argued that the fact that the nurse noticed his enlarged head before he was placed with the B.'s had already exonerated them; the authorities, however, had not yet accepted this argument.

The B.'s second section 388 petition cited the reports that cleared them from blame. It also alleged that K. had been moved to the special needs foster home, and that this was "causing more and more [s]eparation [a]nxiety." Furthermore, because CFS was now claiming that the child had to be in a special medical placement, it alleged that the home he was in was not actually a special needs home and that the B.'s could provide all necessary care — based in part on classes that Ms. B. had taken after the first section 388 petition. Similarly, because CFS was claiming that social workers were having difficulty communicating with the B.'s, the petition alleged that this was false.

This was sufficient to allege that there were changed circumstances and/or new evidence since the denial of the first section 388 petition.  Accordingly, the denial of the first petition was not collateral estoppel.  "'Res judicata or collateral estoppel "was never intended to operate so as to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have occurred which may have altered the legal rights or relations of the litigants."'  [Citation.]" (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 361.)

VI

THE DENIAL OF THE SECTION 388 PETITION

The B.'s raise one and only one contention regarding their section 388 petition: They argue that the trial court erred by ruling on it before ruling on the section 387 petition, rather than the other way round.  They claim they were prejudiced because, on the section 388 petition, they had the burden of showing that placement with them was in the child's best interest, whereas on the section 387 petition, CFS had the burden of showing that it was not.

They forfeited this contention by failing to raise it below.  "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court.  [Citation.]  The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected.

17

[Citation.] [¶] Dependency matters are not exempt from this rule. [Citations.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.)

In any event, the B.'s have not shown that this purported error was prejudicial. (Cal. Const., art. VI, § 13.) The trial court did sustain the section 387 petition; it would still have sustained it, even if it heard it before the section 388 petition. Thus, it would still have denied the section 388 petition. The burdens of proof would have been the same.

VII

THE SUFFICIENCY OF THE EVIDENCE TO SUPPORT

THE ORDER SUSTAINING THE SECTION 387 PETITION

The B.'s contend that the trial court's order sustaining the section 387 petition is not supported by substantial evidence.

"'We review an order sustaining a section 387 petition for substantial evidence.' [Citations.] Evidence is substantial if it is '"""reasonable, credible, and of solid value."""' [Citation.] 'We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record in favor of the juvenile court's order and affirm the order even if other evidence supports a contrary finding.' [Citation.]" (*In re D.D.* (2019) 32 Cal.App.5th 985, 990.)

As the B.'s note, the petition alleged only that "[t]he previous disposition has not been effective in the protection or rehabilitation of the child" because "[t]he caregiver has

18

failed to adequately comply with all components of the case plan." The trial court found this allegation true. It also specifically found that there had been "a breakdown in communication between the B[.'s] and the social workers . . . ."

The evidence amply supports these findings. It showed that the B.'s were refusing to communicate with the social workers. According to the assigned social worker, "CFS staff have repeatedly left detailed[] texts and emails for Ms. B[.] to contact the office," but the B.'s had failed to respond. These included messages left not just by her, but also by other CFS personnel, including C.U.'s social worker.

Ms. B. protested that this was "false." She admitted, however, that since May 2018, she had been refusing to communicate with K.'s social worker or with other CFS workers whom she perceived as the social worker's "friends." She insisted on communicating exclusively through C.U.'s social worker.

The B.'s admitted that they had unilaterally canceled a sibling visit. Ms. B. explained that a social worker (not K.'s social worker, to whom she was not speaking) told her they would not be allowed to be in the room with K. and C.U. during the visit. In response, the B.'s canceled the visit, because they did not "trust them with him."

Mr. B. admitted that the "relationship has broken down," although he claimed that this was because "they" had been discriminating against the B.'s "all along."

Finally, as part of their section 388 petition, the B.'s were asking that K.'s case be removed from the Victorville CFS office, and moreover that the staff of that office be

ordered not to contact them again "[b]y phone, in person, or any form of communication."

The B.'s assert that any communication problems related exclusively to "Mother-son visits." Not so. They affected every communication between CFS and the B.'s. Thus, they made it impossible for CFS to administer the case plan.

The B.'s also argue that the evidence failed to show that they "have failed to adequately comply with *all* components of the case plan . . . ." The allegation, however, was that they were not complying with all components of the case plan — i.e., maybe they were complying with some, but not with all. CFS was not required to prove that the B.'s were not complying with *any* of the components of the case plan.

In sum, then, the true finding on the section 387 petition was supported by substantial evidence.

## VIII

### FAILURE TO CONSIDER RELATIVE PLACEMENT FACTORS

The B.'s contend that the trial court erroneously failed to consider the relative placement factors listed in section 361.3.

The record, however, fails to show that it did not. "A ""judgment or order of the lower court is *presumed correct* [, and a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.'" [Citation.]' . . . '[W]e apply the general rule "that a trial court is presumed to have been aware of and followed the applicable law."' [Citations.]"' . . . [T]hus when 'a

20

statement of reasons is not required and the record is silent, a reviewing court will presume the trial court had a proper basis for a particular finding or order.'  [Citation.]" (*In re Julian R.* (2009) 47 Cal.4th 487, 498-499.)

Separately and alternatively, the B.'s cannot show that the asserted error was prejudicial.

As discussed in part VII, *ante*, the evidence showed that the B.'s were unable to work with CFS.  In addition, in ruling on the B.'s section 388 petition, the trial court refused to return K. to their custody because they were not qualified as a special health care needs foster home.  The B.'s grumble that Ms. B. was "trained to address special-needs care."  Nevertheless, they never actually argue that the trial court erred by denying their section 388 petition (except by hearing it before the section 387 petition).

The child had been placed with the B.'s only for about a month (May 10 through June 15); there was no evidence that he was particularly attached to them.  Admittedly, K.'s sibling was placed with them.  Nevertheless, it is not reasonably likely that, even if the trial court considered all of the section 361.3 factors, it would have let K. remain with the B.'s.

IX

DISPOSITION

The orders appealed from are affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ_____
P. J.

21

We concur:

MILLER                          
                           J.

FIELDS                          
                           J.