Filed 2/19/21  In re James D.L. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JAMES D.L., a Person Coming Under the Juvenile Court Law. | B303560 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19LJJP00092B) |
| Plaintiff and Respondent, | |
| v. | |
| GEORGE D.L., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sabina A. Helton, Judge.  Conditionally affirmed with directions.

Erin Riley Khorram, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

—————————————

## INTRODUCTION

George D.L. (Father) appeals from the juvenile court's disposition order pursuant to Welfare and Institutions Code section 361, subdivision (c),[1] removing one-year-old James D.L. from his physical custody.[2]  Father contends substantial evidence did not support the juvenile court's findings that there were "no reasonable means to protect" James's physical health other than his removal from Father or that "reasonable efforts were made to prevent or eliminate the need for removal."  He also contends the juvenile court and the Los Angeles County Department of Children and Family Services (Department) did not comply with the inquiry and notice requirements of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law.  We conditionally affirm the disposition order and remand for the juvenile court and the Department to comply with the inquiry and notice provisions of ICWA and California law.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. *Dependency Proceedings*

Father and A.E. (Mother) are the parents of James, born in November 2019.  Mother also has a daughter, Y.E., born in May 2017, from a prior relationship.

---

[1]    Statutory references are to the Welfare and Institutions Code.

[2]    When the dependency petition was filed, James was identified as Baby Boy E.

### 1. *Y.E.'s Dependency Proceeding*

On June 5, 2019, the juvenile court sustained a dependency petition filed on behalf of Y.E. under section 300, subdivision (b). The court found Mother had a history of substance abuse and was "a current abuser of marijuana," which rendered her "unable to provide [Y.E.] with regular care and supervision." The court also found Mother had created "an endangering and detrimental home environment for [Y.E.] because Mother allowed [Y.E.'s] Maternal Grandmother . . . and [M]aternal [A]unts . . . to reside in [Y.E.'s] home and have unlimited access to [Y.E.] when [Mother] knew of the Maternal Grandmother and Maternal Aunts' current substance abuse." The juvenile court further found that Y.E.'s "home was in a filthy, unsanitary and hazardous condition. [Y.E.] was at risk of suffering from serious physical harm." The juvenile court ordered Mother to participate in drug and alcohol services, weekly drug testing, parenting education, and individual counseling to address case issues. As of November 2019, however, Mother had "extremely limited to no compliance levels with the court ordered case plan." She had not provided proof of enrollment in drug and alcohol services, parenting education, or individual counseling. She also had failed to appear for 19 weekly drug tests.

### 2. *Referral for James and the Department's Investigation*

In early November 2019, the Department received a referral alleging that James "had tested positive for marijuana at birth." According to the referral, Mother indicated that she planned "to leave the hospital against medical advice, despite still recovering from a C-section and threatened to take [James] with her against medical advice due to [James] not feeding

3

properly." That same day, when the Department met with Mother at the hospital, Mother admitted, "I was using marijuana during my pregnancy because I was getting nauseous." Although she tried anti-nausea medication prescribed by her doctor, it did not work. Mother reported: "As soon as I stopped using marijuana I threw up black mucus. Even water will come out. I was already throwing up yellow bile. I knew this was not helping my baby, so the doctor told me that it was okay to use marijuana through my pregnancy." Mother added: "I was using marijuana 2 times a day. Once in the morning and the second time in the afternoon." Mother admitted she smoked marijuana prior to her pregnancy with James "for pain management due to the pain in her joints." Mother stated, "[S]he was using more [marijuana] during her pregnancy." She also used the drug during her pregnancy with Y.E., who also tested positive for marijuana at birth.

After reporting Mother and James "were doing good," Father told the Department at the hospital, "[H]e will ensure that [James] doesn't leave the hospital until medically cleared." He also stated he and Mother were currently living in the home of the paternal great-grandmother. Father agreed to meet with the Department the following day for an assessment of the home. The Department reported Father "was under [the influence of an] illicit substance due to his eyes being bright red, having a hard time opening them, and slurring his speech."

According to the nurses who were caring for Mother and James, Mother had a history of using marijuana and tested positive for marijuana when she was three months pregnant. The nurses confirmed that James had tested positive for marijuana at birth. The day after Mother gave birth via a

4

Cesarean section, she demanded to leave the hospital.  The nurses explained to Mother "that the baby needs to stay here one more day under observation because he is not latching to the bottle, and we have to make sure he is getting enough milk in his system on his own to maintain his blood sugar stable."  The nurses also had observed that James "was jittery" in the morning.  James was at risk of "failure to thrive if he [was] not eating properly" and maintaining his blood sugar level.  The nurses further reported, "Mother was cursing, screaming, yelling, and walking around the hallway saying that she was going to take [James].  We had to call security to ensure she wouldn't take off with [James]."

The nurses reported concern about Mother's mental health.  According to the nurses, at times, Mother "act[ed] like a child," "suck[ing] on her finger" and having "tantrums."  At one point, Mother became angry at Father and threw him out of her hospital room.  She allowed him to return the next day.  He would keep "his head down" when Mother got upset to not make the situation any worse.  The nurses observed that Father had been "really appropriate" with Mother and James.  Father "was bonding" with James and wanted to take care of him.

Father was not at home for the Department's scheduled assessment of his home.  In a telephone conversation with the Department, the paternal great-grandmother confirmed Father and Mother were currently residing with her.  She stated she had seen Father and Mother "arguing and pushing each other, but nothing more serious."  The paternal great-grandmother also reported that she, Father, and Mother all "use[d] marijuana."  Father tested positive for marijuana on November 8.

5

On November 14, the Department went to paternal great-grandmother's home to serve an order for James's removal from Mother. However, Father did not allow the Department to enter the home. Father explained they would need to wait for the paternal great-grandmother to arrive home and give her consent. Father "stated that he was not in agreement [with James] being detained from [Mother]" and "that he will do what needs to be done in order to maintain [James] under his care." The Department informed Father that Mother was "not to be in the home, or [James] left under her care." In response, Father stated: "How are you going to take my child away from his mother. All she was doing was using weed because of her health. Thank you for ruining my life." In a telephone conversation with Mother, the Department confirmed that Mother was aware of the removal order. Mother understood "that she was not able to stay in the home with [James], as [James] was detained from her." The Department sent Mother the removal order via text message.

B. *Dependency Petition and Initial Hearings*

1. *Petition*

On November 18, 2019, the Department filed a dependency petition on behalf of James under section 300, subdivisions (b) and (j). The petition alleged James was born suffering from the "detrimental condition of drug withdrawal including poor feeding, inability to latch onto a bottle, and a positive toxicology screen for marijuana" due to Mother's substance abuse. The petition further alleged Mother had "a history of substance abuse," was "a current abuser of marijuana," and was failing to comply with her court-ordered case plan for James's sibling Y.E., who was a "current dependent [of the court] due to Mother's substance

6

abuse." The petition alleged Father "knew of [Mother's] substance abuse and failed to take action to protect [James]."

The Department recommended "[James] be removed from the [F]ather's care . . . due to [Father] testing positive for marijuana, not allowing the Department to assess [Father's] home, and that [Father] insists that [James] will be with [Mother]. The Department is very worried that the [F]ather will allow [Mother] unlimited and unmonitored access to [James]."

### 2. *November 2019 Hearing*

At the November 19, 2019 detention hearing, the juvenile court found a prima facie case for detaining James and finding that James was a person described by section 300. The juvenile court detained James from both Mother and Father. The juvenile court found: "The court's decision today is based on . . . as to [Mother], on her utter lack of compliance with services as to the older sibling and her ongoing substance abuse issues. As to the Father, the court is very concerned about the statements he made regarding his refusal to be protective of [James] from [Mother], his lack of cooperation by the Department, and his . . . unwillingness to even make [James] available for contact with the Department. There are no safety measures that can be put in place today. The court is going to detain [James] from both parents today, and will order monitored visits . . . ." Because Mother and Father did not attend the hearing, the juvenile court scheduled an arraignment hearing for November 22, 2019.

### 3. *Arraignment Hearing*

Following the detention hearing, the Department went to Father's home to detain James. Although the home smelled of cigarette smoke and contained two ashtrays, Father denied the

7

family smoked inside the home. Father accompanied the social worker to his bedroom to show her James's crib, but initially left the lights off in the room. At the social worker's request, Father turned on the lights, revealing a woman lying on the bed with her face covered by a pillow. When the social worker asked if the woman was Mother, Father "hesitated and stated 'No the lady is.' [The social worker] cut [F]ather off, and asked the lady if she was [Mother]." Mother then "lifted up her head." Father told the social worker, "I couldn't leave her out there after her car broke down. It wasn't safe for her."

At an arraignment hearing on November 22, 2019, after the juvenile court appointed counsel for Mother and Father, they entered a general denial to the petition. In their Notification of Mailing Address forms signed on November 22, 2019, Mother and Father listed paternal great-grandmother's home as their mailing address. Father's counsel requested that the juvenile court release James to Father, arguing: "We have information that he was appropriate with his newborn son, even though he is a first-time new father. . . . The [Department] indicated in the detention report that they have been unable to assess his home. We do have last-minute information of today's date that indicates his home has actually been assessed. . . . [Father] is representing to me that Mother has moved out of the home . . . . [Father] at this point is willing and able to abide by any court orders. I think the only thing that we can say about [Father] is that he is sympathetic to [Mother]. . . . I think the social worker could have made reasonable efforts to prevent detention. I think a more clear and thorough conversation with [Father] would have resulted in his understanding of the importance of being protect[ive] in terms of preventing [Mother] from having access to

8

[James] even if he doesn't necessarily feel or didn't necessarily feel at the time that [Mother's] actions were so egregious that she had to be kicked out of the home. . . . He tested positive for very low levels of marijuana. . . . I think that now given the situation we are in, the court can admonish him of the importance of having [Mother] not in the home."

Counsel for James opposed [Father's] request, arguing: "[Father] indicated that he was . . . in the hospital with [James] and that [Father] wanted his home to be assessed. However, the report also indicates on page 6 that [Father] appeared to be under illicit substances, his eyes were red, he had a hard time opening them, he was slurring his speech. Not until the 19th of November was the home made available for an assessment. The Mother was in the home. There is no indication that the Father outside of today would cooperate with the court orders excluding the Mother from the home. . . . There is no indication that the Mother has moved out of that home and that the Father would comply with the orders if the court detained from Mother and released to the Father at this point in time."

The juvenile court denied Father's request and ordered that James remain detained from Mother and Father. Addressing Father, the court stated: "I get it, kind of a human instinct of wanting to help . . . [Mother]–I understand that–but I have to know you're going to put [James] ahead of [Mother]. That's what I have to know. And right now sitting here today I don't see that based on the reasons stated by county counsel and minor's counsel so I do think . . . detention is appropriate for both parents. . . . I hope that changes in the future; that you're always going to be able to put [James] ahead of [Mother], and that's what I need to see before I can release especially a young child like this

back to a parent." The juvenile court scheduled the jurisdiction and disposition hearing for December 12, 2019.

### C. *Jurisdiction/Disposition Hearing*

#### 1. *The Department's Report*

In her interview with the Department, Mother reported that "she had been smoking marijuana since she was 19 years old." Mother stated that she smoked marijuana throughout her pregnancy with her older child Y.E. and that "she never stopped smoking marijuana after giving birth to [Y.E.]." Mother also smoked marijuana throughout her pregnancy with James. Although her obstetrician prescribed anti-nausea medication, it only worked for a few days. Mother was continuing to lose weight during the pregnancy, which her obstetrician advised "was unhealthy for the baby." Mother understood marijuana use in pregnancy was "not good for the baby," but she felt "it was more important to stop losing weight." Mother stated that her doctor "advised her that if she was going to smoke that she should do it from a bong" and that Father was aware of her marijuana use. When asked about the status of her case plan for Y.E, although Mother admitted she had not been drug testing or attending a substance abuse program, she maintained the failure to do so was "not her fault."

In his interview, Father stated that, when he met Mother in November 2017, "he did not know she smoked marijuana." Father and Mother broke up for a period of time in February 2019, and he moved to Bakersfield. Father first became aware of Mother's marijuana use in late June 2019, when he moved back to the area and reunited with her. After stating that "he has never been a fan of marijuana use or illegal drug use in general," Father told the Department that he told Mother, "[H]e didn't

10

want her to smoke marijuana while [she was] pregnant." According to Father, "the reason [Mother] pursued trying natural remedies and the medication was because of his insistence." However, the medication prescribed by Mother's doctor only worked for a few days. Although he knew Mother's marijuana use during pregnancy "was not good for the baby," Father "backed off after seeing that marijuana was the only thing that helped with [M]other's nausea."

Father admitted he smoked marijuana once with Mother about two weeks before she gave birth to James. When the Department asked Father "why he would smoke marijuana with [M]other if he didn't like that she was smoking marijuana while pregnant," Father stated: "'I can understand where you are coming from, but I had worked a 16 hour shift as security, I had been on my feet for 14 hours, and when I got home I couldn't fall asleep." Although he denied he was a frequent user of the drug, Father explained he decided to smoke marijuana with Mother because "his feet were sore and he couldn't relax."

The Department also spoke with the office manager for Mother's obstetrician. The office manager could not confirm that Mother was a patient because the office did not have "a release of information on file" for Mother. However, the manager reported that no obstetrician affiliated with the office would "approve of a patient smoking marijuana during pregnancy." In its report, the Department stated that Father had attended two monitored visits with James since the detention hearing on November 22, 2019. The first visit on November 27 went well, and Father provided "appropriate care" to James. He held James throughout the visit and tended to his needs, including feeding him a bottle and changing his diaper. Father also notified the monitor when

11

he observed James had a diaper rash. Mother's first visit with James had not taken place.

The Department recommended the juvenile court find that James was a person described by section 300, subdivisions (b) and (j), and order his "continued detention." The Department concluded, "Given both parent's recent marijuana use, [F]ather's lack of compliance with court orders . . . the Department believes that neither parent has the capacity to adequately care for or protect a newborn child." The Department explained Mother had admitted to using marijuana throughout her pregnancies with Y.E. and James, resulting in the children testing positive for marijuana at birth. In addition, Mother had made "no progress" with her case plan in the dependency proceeding for Y.E. and had "not mitigated any of the safety concerns that resulted in Y.E.'s detention." The Department also observed that Father "has not shown any protective factors that would indicate he would ensure [James's] safety from future neglect or abuse by [Mother]. . . . [F]ather and [M]other's admission to using marijuana together while [M]other was pregnant with [James], would support that [F]ather had no issues with [M]other's use of marijuana while pregnant and did in fact fail to protect his son from prenatal exposure to marijuana resulting in a positive toxicology result for THC at the time of birth. . . . [The Department] found [M]other in [F]ather's bedroom. Father had initially tried to keep [M]other's presence hidden from the [Department] by not turning on the bedroom light, but after the social worker[']s insistence on turning the light on, it became evident that [M]other was in the room."

## 2. December 2019 Hearings

At the December 12, 2019 jurisdiction and disposition hearing, Father testified that he "highly" regretted smoking marijuana with Mother on one occasion when she was pregnant with James. He also stated he made a "mistake" when he allowed Mother to stay in his home "because of the substance abuse, the problem that [Mother] has, and because that is what the court ordered." Father testified that he would be able to protect James even if that meant Mother could not stay in the home and could only have monitored visits. Father also testified that he would allow the Department to make unannounced visits to his home at any time. He explained he previously had denied the Department entry because paternal great grandmother was "very old school," and "she didn't understand what was going on." She was now willing to allow the Department in the home. Father further testified he was visiting with James three times a week. The visits were going "very well," and he was having a "great time bonding with [his] son." Father wanted to spend more time with James and be with him "all day, every day."

On cross-examination, contrary to his earlier testimony, Father testified he did not believe Mother had a substance abuse problem. However, when asked whether he believed James was at risk in Mother's care, Father answered, "Oh, yes." Father also testified he did not believe James would be safe with Mother because of "the drug use and she didn't finish none of her parenting classes and all the stuff the court held against her." After denying he currently smoked marijuana, Father testified he stopped using the drug two weeks before James's birth. He also denied he was under the influence of any drugs when he first met with the Department at the hospital. Father testified: "I was the

13

one dealing with [James], like the whole time.  Every time he woke up, I fed him his bottle.  I was up for approximately 36 hours, and I had a shift at work a day before my child was born.  So I was already tired.  I had been up for hours on end."  Although Father did not believe he had a substance abuse problem, he was willing to submit to drug testing.

James's counsel and the Department asked the juvenile court to sustain the petition.  James's counsel argued:  "As to the Father, I do believe the Department has made their case that the Father has failed to protect.  He did smoke marijuana with Mother, according to the report, two weeks prior to [James's] birth.  I do believe that places [James] at risk.  It is one thing to suggest someone stop, but it is another—the situation escalates when a person is actively engaging in substance abuse with someone who is pregnant."

The juvenile court sustained the dependency petition on behalf of James pursuant to section 300, subdivisions (b) and (j), and declared James a dependent of the juvenile court.  With respect to disposition, Father's counsel requested that the juvenile court release James to Father.  Father's counsel argued: "[T]he court must find by clear and convincing evidence that there—not only that there be a substantial risk of detriment to this child, but that there are no reasonable means to protect the child in the home of the Father [and] the Department must make reasonable efforts to prevent further removal."  Father's counsel further argued:  "When we look at reasonable means to protect the child, Father has indicated he is open to drug testing.  He is open to having the Department make unannounced home visits.  The Court can order family preservation, which would be another set of eyes and ears in the home, people who would be going

14

frequently to see how is Father doing, how is the baby doing. . . . The Department has not . . . done reasonable efforts to prevent further detention of this child. . . . The Department should have verified these things. . . . Father represents to me and has represented to the Court that Mother is no longer living there. . . . The Department has a burden to show why this child should be removed from his Father. . . . The Department is not able to show anything other than what the court has sustained as true, that Father engaged in smoking marijuana with the Mother, that it was a bad decision, and that he is remorseful about it. . . . [The Department] can't present the evidence as clear and convincing . . . that Father should not have his child."

Counsel for James and the Department joined in requesting the juvenile court remove James from the custody of both parents. James's counsel argued: "Father's testimony, at best, is a step in the right direction, but there is a long way to go. . . . Father does not think that Mother has a problem based on the statements he certainly made to the social worker and his later corrected testimony. . . . Father enabled the Mother. He smoked with her while she was pregnant. He tried to conceal her from the social worker after the case had opened . . . There is clear and convincing evidence of risk of exposure to further substance abuse or further harm because [Father] lacks insight into the nature of [M]other's problem and a protective capacity." After stating that "it is clear that [James] would not be safe in the home of Father," the Department argued: "Prior to this case being filed, the Department did attempt to work with the Father. They set up an appointment to see his home. He didn't show up at one point. Then they did do a home assessment. . . . Father attempted to conceal that the Mother was in the home by having

15

the lights out. . . . Reasonable means to protect without removal would require that the court trust the Father, who does not believe Mother has a substance abuse problem, who has demonstrated during investigation that he is willing to hide the Mother in the home to try to prevent the social worker from seeing the Mother in the home. . . . With the Father, I think it's more likely than not that he did smoke more than once with the Mother while she was pregnant, and I don't believe it's credible that he wasn't smoking all the time, as marijuana is still in his system."

In ruling that "suitable placement [was] appropriate for [James]," the juvenile court found: "[James] is very, very young, and the parents need to be fully present and fully engaged at this young age or there is a danger to [James]. I have read and considered the evidence. Based on the facts found true in the sustained petition, along with the . . . evidence and testimony considered, the court finds by clear and convincing evidence that remaining in the home of the parents would pose substantial risk of detriment to [James's] physical health, safety, protection, and/or physical or emotional well-being, and there are no reasonable means that [James's] health and well-being can be protected without removing [James] from the parents' physical custody."

The juvenile court ordered a full drug and alcohol program with aftercare, a 12-step program, random or on-demand drug and alcohol testing, parenting education, and individual counseling to address case issues for Mother and "10 random or on-demand consecutive drug tests" and parenting education for Father. The juvenile court also ordered monitored visitation for Mother and Father. At the conclusion of the hearing, the juvenile

16

court advised Mother and Father: "Both parents should know because [James] is under the age of three, failure to participate regularly and make progress in court-ordered treatment programs may result in termination of reunification services six months from today. So because [James] is very young, the law provides for a much shorter period to try get through your programs and make sure you are showing good progress."

D. *Father's Possible Indian Ancestry*

At the November 22, 2019 arraignment hearing, Mother and Father submitted a Parental Notification of Indian Status form (Judicial Council Form ICWA-020). Mother indicated on her form she had "no Indian ancestry." Father stated on his form he "may have" "Blackfoot" Indian ancestry through the paternal grandmother and the paternal grandfather. At the arraignment hearing, in response to Father's disclosure that "he may have Indian ancestry," the juvenile court asked Father if either paternal grandparent had "an enrollment card or tribe number." Father answered: "Oh, no. We are no part of no tribe. . . . It's like we have Blackfoot Indian in our blood. My mother and my father both have small traces of Blackfoot." The juvenile court ordered the Department to "look into that and send out any appropriate ICWA notices, if appropriate. I will hold that in abeyance, although it looks like it will probably be a 'no ICWA finding.'" The juvenile court found ICWA did not apply as to Mother.

In an interview with the Department, Father reported that the paternal grandmother and the paternal grandfather "have Blackfeet [ancestry]." After calling the paternal grandparents during the interview, Father provided the Department with "additional family information." The Department also

17

interviewed the paternal great-grandmother about Father's claim and "obtained additional information pertaining to family members on the paternal side[ ] of the family." The Department's report stated that "ICWA notices will be mailed out on 12/05/2019 to the Blackfeet Tribes. The Department will submit a copy of the notice and all certified mail receipts via a [Last Minute Information] before the hearing on 12/12/2019."

However, the Department did not file copies of any ICWA notices or certified mail receipts. The Department also did not provide any additional information about its ICWA investigation. At the jurisdiction and disposition hearing, the juvenile court did not inquire about the status of the Department's investigation or ICWA notices, nor did it make any findings regarding whether ICWA applied as to Father.

Father timely appealed.

## DISCUSSION

Father argues: "Substantial evidence did not support a finding of no reasonable means to protect [James] at disposition where Father had put safeguards in place and [the Department] did not attempt to put any safeguards in place to allow James to remain with Father." Father further argues, "James should [not] be removed from Father's physical custody." Father also argues the juvenile court and the Department failed to comply with the inquiry and notice requirements of ICWA and related California law.

A. *Substantial Evidence Supported the Disposition Order*

1. *Applicable Law and Standard of Review*

"'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361

18

unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065; accord, *In re G.C.* (2020) 48 Cal.App.5th 257, 265; *In re D.C.* (2015) 243 Cal.App.4th 41, 51, 54; see § 361, subd. (c)(1).) The juvenile court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332; accord, *In re N.M.* (2011) 197 Cal.App.4th 159, 170.) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.'" (*In re N.M.*, at pp. 169-170; accord, *In re D.B.,* at p. 328.)

We review challenges to the sufficiency of the evidence underlying disposition orders for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re D.B.*, *supra*, 26 Cal.App.5th at p. 328.) "'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact

could make such findings.'" (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; accord, *In re D.C., supra,* 243 Cal.App.4th at p. 52.) "'But substantial evidence "is not synonymous with any evidence. [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal."'" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.)  ""'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence."'" (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420; see *In re Donovan L.* (2016) 244 Cal.App.4th 1075, 1093 [a "juvenile court's conclusion 'supported by little more than speculation' [is] not based on substantial evidence"].)

""'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J., supra*, 56 Cal.4th at p. 773; accord, *In re S.R.* (2020) 48 Cal.App.5th 204, 219.)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011; accord, *In re V.L.* (2020) 54 Cal.App.5th 147, 155 ["*O.B.* is controlling in dependency cases"].) "The appellant has the burden of showing there is no evidence of

a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; accord, *In re D.B.*, *supra*, 26 Cal.App.5th at pp. 328-329; *In re D.C., supra,* 243 Cal.App.4th at p. 52; *In re A.E.* (2014) 228 Cal.App.4th 820, 826.)

### 2. *Substantial Evidence Supported Removal*

Substantial evidence supported the juvenile court's findings that there were "no reasonable means to protect" James's physical health other than his removal from Father and that "reasonable efforts were made to prevent or eliminate the need for removal." Father knew Mother regularly smoked marijuana during her pregnancy with James. Father also used the drug with her in the late stages of her pregnancy. Paternal great-grandmother reported that she, Mother, and Father all "use[ed] marijuana." Despite Father's failures to protect James before his birth, based on the Department's request, the juvenile court initially removed James only from Mother's physical custody.

After James was born, Father continued to fail to protect James. Although the Department reported that he was under the influence of an "illicit substance" at the hospital, Father was present in the hospital when the nurses called security to prevent Mother from leaving with James. Despite telling the Department at the hospital that he wanted to have his home assessed, Father was not at home for the Department's assessment of his home. When the Department later went to Father's home to serve an order removing James from Mother, Father refused to allow access. Father told the Department "that he was not in agreement [with James] being detained from [Mother] and that '[a]ll she was doing was using weed because of her health.'" The Department's report also recounted Father's attempt to conceal Mother's presence in his home when the Department was finally

21

able to conduct the home assessment. At the jurisdiction and disposition hearing, while Father expressed regret for his prior conduct, he also testified on cross-examination he did not believe Mother had a substance abuse problem. Based on Father's conduct, the Department concluded that Father had "not shown any protective factors that would indicate he would ensure [James's] safety from future neglect or abuse by [Mother]" and that "he would allow [Mother] to have unlimited and unmonitored access to [James]." As the juvenile court observed, while Father's "human instinct of wanting to help" Mother was understandable, Father needed to place the health and safety of James first. Father repeatedly failed to do so. The juvenile court reasonably could have inferred that Father had not gained insight into Mother's substance abuse problem or the substantial risk of harm it posed to James.

At the jurisdiction and disposition hearing, the Department's counsel argued the Department had made reasonable efforts to prevent removal by "attempt[ing] to work with [Father]" to conduct a safety assessment of his home, and Father had thwarted those efforts by initially denying access to the home and then actively trying to conceal Mother's presence. The Department's counsel further argued that "reasonable means to protect without removal would require that the Court trust [Father] . . . to not allow [Mother] back into the home." In ordering James's removal from Mother and Father, the juvenile court reasonably concluded: "I have to agree with minor's counsel and county counsel, and suitable placement is appropriate for [James]. I also would add, obviously, that this child is very, very young, and the parents need to be fully present and fully engaged at this young age or there is a danger to [James]." Given Father's

22

efforts to conceal Mother's presence in the home and his refusals to cooperate with the Department, the juvenile court reasonably agreed with the Department and James's counsel that there was no reasonable means to protect James other than his removal from Father and that the Department made efforts to attempt to eliminate the need for referral.

There was substantial evidence from which a reasonable trier of fact could have found it highly probable there was a substantial risk of physical harm to James if he was returned home to Father, there were no reasonable alternatives to removal, and the Department made reasonable efforts to eliminate the need for removal. (*Conservatorship of O.B., supra*, 9 Cal.5th at p. 1011.)

Father's reliance on *In re Ashly F.* (2014) 225 Cal.App.4th 803 (*Ashly F.*) is misplaced. In *In re Ashly F.*, the Department removed children from their home based on allegations that the mother physically abused the children and that the father failed to protect them from mother's abuse. (*Id.* at pp. 806-807.) Mother and father cooperated with the Department. Mother removed herself from the family home following the detention hearing, and father "had already completed a parenting class." (*Id.* at p. 810.) In its jurisdiction and disposition report, the Department did not describe what "reasonable means" for protecting the children were considered, or what "reasonable efforts" it had made to prevent the children's removal from their home. (*Id.* at p. 808.) The Department's report also did not reveal whether the Department had assessed father's home and did not contain evidence supporting its conclusions. (*Ibid.*) At the jurisdiction and disposition hearing, when ordering the

children's removal from the custody of both parents, the juvenile court did not state any facts supporting its findings, nor did it consider whether mother's removal from the home was a reasonable means of protecting children. (*Ibid*.) Concerned that these section 361 requirements "can become merely a hollow formula designed to achieve the result the [Department] seeks," the court in *In re Ashly F.* reversed the disposition order because the evidence did not support the juvenile court's findings that the Department had made "reasonable efforts" to prevent the children's removal or that there were no "reasonable means" to protect the children other than removal. (*Id.* at p. 805.) The court explained that "[a]mple evidence existed of 'reasonable means' to protect [the children] in their home." (*Id.* at p. 810.) The court held that the juvenile court should have considered whether mother's removal from the home was a "reasonable means" of protecting the children. (*Ibid*.)

Here, in contrast to the cooperating parents in *In re Ashly F.,* Mother and Father refused to cooperate with the Department and obey court orders. The juvenile court's initial removal order detained James only from Mother. After Father failed to cooperate with the Department's efforts to assess whether James would be safe with Father and violated court orders by providing Mother access to James, the Department recommended that the court detain James from Father. Because of Father's conduct, at the disposition hearing the juvenile court was concerned about protecting a "very, very young" child and reasonably concluded that James's safety required his removal from Father. Under these circumstances, the juvenile court did not err in removing James from Father's custody.

24

B. *The Department and the Juvenile Court Failed To Comply With ICWA*

1. *Applicable Law*

a. *ICWA inquiry requirements*

"ICWA established minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048.) Under ICWA and the California law implementing it, "'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see § 224.1, subd. (a) [adopting the federal definition]; *In re D.S.*, at p. 1048 ["[a]n 'Indian child' is defined in the same manner [under California law] as under federal law"].)

"ICWA itself does not impose a duty on courts or child welfare agencies to inquire as to whether a child in a dependency proceeding is an Indian child. [Citation.] Federal regulations implementing ICWA, however, require that state courts 'ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child.' [Citation.] The court must also 'instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.'" (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882-883; see 25 C.F.R. § 23.107(a).)

In addition, "ICWA provides that states may provide 'a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under' ICWA. (25 U.S.C. § 1921.) Under California law, the court and

25

county child welfare department 'have an affirmative and continuing duty to inquire whether a child,' who is the subject of a juvenile dependency petition, 'is or may be an Indian child.' (§ 224.2, subd. (a); see . . . Cal. Rules of Court, rule 5.481(a).) The child welfare department's initial duty of inquiry includes 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' (§ 224.2, subd. (b).)" (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 883; accord, *In re T.G.* (2020) 58 Cal.App.5th 275; *In re D.F.* (2020) 55 Cal.App.5th 558, 566; *In re D.S., supra,* 46 Cal.App.5th at p. 1049.)

"California law also requires 'further inquiry regarding the possible Indian status of the child' when 'the court, social worker, or probation officer has reason to believe that an Indian child is involved [or, under Cal. Rules of Court, rule 5.481(a)(4), "may be involved"] in a proceeding. . . . ' (§ 224.2, subd. (e).")) (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 883.) Former section 224.2, subdivision (e), which is applicable to this appeal, did not define "reason to believe." (*In re Austin J.*, at p. 883 [the "Legislature, which added the 'reason to believe' threshold for making a further inquiry in 2018, [had] not define[d] the phrase"].)[3] "When

---

[3] The Legislature, however, has since amended section 224.2, subdivision (e), effective September 18, 2020, to provide a definition. (Assem. Bill No. 2944 (2019-2020 Reg. Sess.); Stats. 2020, ch. 104, § 15.) As amended, the statute now provides: "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership

that ['reason to believe'] threshold is reached, the requisite 'further inquiry' 'includes: (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe.'" (*Ibid.*; see § 224.2, subd. (e)(2)(A)-(C); former § 224.2, subd. (e)(1)-(3).) "Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under" ICWA and "shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C); see former § 224.2, subd. (e)(3)). Notably, "[t]he sharing of information with tribes at this inquiry stage is distinct from formal ICWA notice, which requires a 'reason to know'—rather than a 'reason to believe'—that the child is an

---

in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know [that a child is an Indian child] enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)." (§ 224.2, subd.(e)(1).) Effective January 1, 2020, California Rules of Court, rule 5.481(a)(4), now provides: "If the social worker . . . or petitioner knows or has reason to know *or believe* that an Indian child is or may be involved, that person or entity must make further inquiry as soon as practicable . . . ." (Emphasis added.) Notwithstanding these amendments, we refer in our opinion to section 242, subdivision (e), and California Rules of Court, rule 5.481(a)(4) as they read in December 2019 when the jurisdiction/disposition hearing took place.

27

Indian child." (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1049.)

b.      *ICWA notice requirements*

"In addition to the inquiry that is required in every dependency case from the outset and the 'further inquiry' required under California law when there is a 'reason to believe' an Indian child is [or may be] involved, a third step—notice to Indian tribes—is required under ICWA and California law if and when 'the court knows or has reason to know that an Indian child is involved.'" (*In re Austin J.*, *supra*, 47 Cal.App.5th at pp. 883-884; see 25 U.S.C. § 1912(a); § 224.3, subd. (a); Cal. Rules of Court, rule 5.481(b)(1); see also *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1050 ["If the inquiry establishes a reason to know an Indian child is involved, notice must be provided to the pertinent tribes."].)

A "'reason to know' exists under any of the following circumstances:  '(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child who is the subject of the proceeding gives the court reason to know [he or she] is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[;] and [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an

28

Indian tribe.' (§ 224.2, subd. (d).)" (*In re D.S.*, *supra*, 46 Cal.App.5th at pp. 1049-1050.)

Notice to a tribe "must include enough information for the tribe to 'conduct a meaningful review of its records to determine the child's eligibility for membership.'" (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1050; see *In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576 ["[t]he purpose of the ICWA notice provisions is to enable the tribe or the [Bureau of Indian Affairs] to investigate and determine whether the child is in fact an Indian child"].) This includes providing "identifying information for the child's biological parents, grandparents, and great-grandparents, to the extent known." (*In re D.S.*, at p. 1050; see § 224.3, subd. (a)(5)(C).) "A determination by an Indian tribe that a child is or is not a member of, or eligible for membership in, that tribe . . . shall be conclusive." (§ 224.2, subd. (h).)

To summarize: An initial "duty of inquiry applies to every 'child for whom a petition under Section 300, 601, or 602 may be or has been filed' (§ 224.2, subd. (a))," the "duty of further inquiry applies when there is a 'reason to believe that an Indian child is involved [or, under Cal. Rules of Court, rule 5.481(a)(4), "may be involved"] in a proceeding' (§ 224.2, subd. (e))," and "the duty to provide notice to Indian tribes applies only when one knows or has a 'reason to know . . . an Indian child is involved.'" (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 884; see *In re M.W.* (2020) 49 Cal.App.5th 1034, 1047 ["a 'reason to believe' the minor is an Indian child triggers requirements less rigorous than does a 'reason to know'"].)

2. *Standard of Review*

Where the juvenile court finds ICWA does not apply to a child, "[t]he finding implies that . . . social workers and the court

29

did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry." (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 885; see *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1050 ["[t]he juvenile court may . . . make a finding that ICWA does *not* apply because the Agency's further inquiry and due diligence was 'proper and adequate' but no 'reason to know' whether the child is an Indian child was discovered"].) "We review a court's ICWA findings for substantial evidence. [Citations.] 'We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.'" (*In re Austin J.*, at p. 885.) The appellant "'has the burden to show that the evidence was not sufficient to support the findings and orders.'" (*Ibid.*)

> 3. *The Juvenile Court and the Department Failed To Comply with ICWA's Inquiry and Notice Requirements*

Father argues, "[T]he trial court erred when it did not require [the Department] to provide notice to the Blackfeet tribe[s] nor conduct a full inquiry into Father's claim of potential Indian heritage. The court had a responsibility to ascertain that [the Department] had conducted an adequate investigation." The Department asserts that "the notice requirements of the ICWA were not triggered" because "Father's clear and explicit denial of any tribal affiliation and his assertion of only 'small traces' of Indian heritage did not give the juvenile court or [the Department] 'reason to know' or 'reason to believe' that James was an 'Indian child'—a child who was a tribe member or who had a parent member and was eligible for membership." We conclude the juvenile court and the Department failed to comply

30

with the inquiry and notice provisions of ICWA and related California law.

In his ICWA-020 form, Father indicated he "may have" "Blackfoot" ancestry through the paternal grandmother and the paternal grandfather. When the juvenile court inquired about Father's statement, Father denied that the paternal grandparents were enrolled in a tribe. However, Father also stated that his family had "Blackfoot Indian in our blood" and that his parents "have small traces of Blackfoot." Based on the information provided by Father, the juvenile court ordered the Department to "look into" Father's claim and "send out any . . . ICWA notices, if appropriate." After interviewing Father and the paternal great-grandmother and obtaining "additional family information," the Department reported that it would send ICWA notices to "the Blackfeet Tribes" and submit the ICWA notice and the certified mail receipts prior to the jurisdiction and disposition hearing.

Based on Father's statements of Indian ancestry, the Department and the juvenile court were required to make further inquiry under section 224.2, subdivision (e). (See *In re T.G., supra,* 58 Cal.App.5th at 289 ["just as proper notice to Indian tribes is central to effectuating ICWA's purpose, an adequate investigation of a family member's belief a child may have Indian ancestry is essential to ensuring a tribe entitled to ICWA notice will receive it"]; *In re M.W., supra,* 49 Cal.App.5th at p. 1044 [father's statement he may have Indian ancestry even though he could not identify the tribe, "trigger[ed] the provisions of section 224.2, subdivision (e), which required the court and the Department to make further inquiry as soon as practicable"]; *In re D.S., supra*, 46 Cal.App.5th at p. 1052 [aunt's statement of

possible Indian ancestry established a reason to believe the child was an Indian child and "triggered a duty to conduct a further inquiry"].)

However, although the Department stated that it conducted further investigation and would mail "ICWA notices . . . to the Blackfeet tribes," we do not know what "additional" information the Department obtained or whether the Department mailed notices to the "Blackfeet Tribes" and the government agencies as required by section 224.2, subdivision (e).  The Department failed to submit copies of any ICWA notices or certified mail receipts to the juvenile court.  We also do not know whether the Department received any responses to its communications.  (See *In re T.G., supra,* 58 Cal.App.5th at p. 290 ["[t]hat duty of further inquiry requires interviewing, 'as soon as practicable,' extended family members, contacting the Bureau of Indian Affairs and '[c]ontacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility'"]; *In re A.M.* (2020) 47 Cal.App.5th 303, 322 [mother's statement she had been told she may have Indian ancestry with Blackfeet and Cherokee tribes and identification of her grandfather as having possible Indian ancestry, while not requiring ICWA notice, were sufficient to require further inquiry under section 224.2, subdivision (e)].)

At the jurisdiction and disposition hearing, the juvenile court failed to make an inquiry about the status of the Department's ICWA investigation, including whether the Department had provided notice to the Blackfeet tribes as indicated in the jurisdiction/disposition report.  Although the juvenile court previously had stated it was holding any ICWA

32

finding as to Father "in abeyance," the juvenile court also failed to make any finding regarding the applicability of ICWA and whether the Department conducted an adequate inquiry, as required under section 224.2. (See § 224.2, subd. (i)(2) ["[i]f the court makes a finding that proper and adequate further inquiry and due diligence . . . have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings"].)

The Department's reliance on *In re Austin J.*, *supra*, 47 Cal.App.5th 870 is unpersuasive. In *In re Austin J.*, after the children's mother and a maternal great aunt told the Department that the family may have Cherokee ancestry, the juvenile court held ICWA did not apply at the jurisdiction/disposition hearing. (*Id*. at pp. 878-879.) Explaining that the mother's and great aunt's statements "merely suggest the possibility that the children may have Cherokee ancestry" and "do not constitute information that a child 'is an Indian child,'" the court rejected mother's argument that the Department was required to provide notice to the Cherokee tribes. (*Id*. at p. 887.) In also holding that there was "no duty to make further inquiry" based on the mother's and great aunt's statements, the court explained: "At most, they suggest a mere possibility of Indian ancestry. Indian ancestry, heritage, or blood quantum . . . is not the test; being an Indian child requires that the child be either a member of a tribe or a biological child of a member. . . . Indian ancestry, without more, does not provide a reason to believe that a child is a member of a tribe or is the biological child of a member. Here, there is nothing more." (*Id*. at pp. 888-889.) "[T]he fact disclosed through the social worker's initial inquiry regarding the possibility that the children are Indian children—that Mother

33

may have Cherokee ancestry—is insufficient by itself to provide a reason to believe that either the children or their parents are members of, or eligible for membership in, an Indian tribe." (*Id*. at p. 889.)

Recently, however, this court expressed its disagreement with "*Austin J.*'s narrow reading of the nature and quality of information sufficient to trigger the duty of further inquiry." (*In re T.G., supra,* 58 Cal.App.5th at p. 294.) As we explained, *In re Austin J.*'s "insistence a parent's express statement of Indian ancestry does not constitute a reason to believe an Indian child may be involved is fundamentally at odds with well-established ICWA law. To be sure, an 'Indian child' is defined in terms of tribal membership, not ancestry. But the question of membership is determined by the tribes, not the courts or child protective agencies." (*Ibid*.) Moreover, "[g]eneral information from the family about its ancestry frequently provides the only available basis to believe an Indian child may be involved. [Citation.] Additional investigation may not develop further information establishing the need for ICWA notice, but it is essential to the enforcement of the court's and child protective agency's 'affirmative and continuing duty to inquire' to construe broadly the duty to make further inquiry." (*Id*. at p. 295; see § 224.2, subd. (a).)

In this case, Father's statements that he "may have Indian ancestry" in a Blackfeet tribe through the paternal grandmother and the paternal grandfather and that his family has "Blackfoot Indian in our blood" were sufficient to trigger the duty of further inquiry. (*In re T.G., supra,* 58 Cal.App.5th at p. 292 ["[t]hese preliminary responses from the mother and maternal grandmother [of "Cherokee" and "possible Indian ancestry"]

34

unquestionably provided reason to believe Indian children might be involved in these dependency proceedings and triggered the Department's duty to make further inquiry, as mandated by section 224.2, subdivision (e), and rule 5.481(a)(4)"]; see also *In re N.G.* (2018) 27 Cal.App.5th 474, 481 [duty to make further inquiry triggered by initial report the children may have Blackfeet, Navajo or Cherokee ancestry]; *In re K.R.* (2018) 20 Cal.App.5th 701, 705, 707 [duty of further inquiry triggered by information the children might have Cherokee heritage through their father].)

As the court observed in *In re K.R.*, *supra*, 20 Cal.App.5th 701, "[A] social services agency has the obligation to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status. [Citation.] The agency cannot omit from its reports any discussion of its efforts to locate and interview family members who might have pertinent information and then claim that the sufficiency of its efforts cannot be challenged on appeal because the record is silent. [¶] Nor can the juvenile court assume that because *some* information was obtained and relayed to the relevant tribes, the social services agency necessarily complied fully with its obligations. On the contrary, once there is sufficient information to believe that the children might be Indian children within the meaning of ICWA and the California statutes, 'responsibility for compliance' with those statutes 'falls squarely and affirmatively' on both the social services agency and the court." (*Id.* at p. 709.)

Here, the juvenile court failed to ensure the Department had fully complied with the inquiry and notice requirements of ICWA and compounded the error by failing to make the requisite

finding regarding whether ICWA applied as to James. Accordingly, we must remand for the juvenile court to determine whether the inquiry and notice requirements have been satisfied and whether James is an Indian child within the meaning of ICWA and California law.

## DISPOSITION

The disposition order is conditionally affirmed. The matter is remanded to the juvenile court for full compliance with the inquiry and notice requirements of ICWA and related California law and for further proceedings not inconsistent with this opinion.


DILLON, J.[*]


We concur:


PERLUSS, P. J.


FEUER, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.